ATTORNEY GENERAL, *ex rel.* STATE BANKING
COMMISSIONER, *v.* MICHIGAN NATIONAL BANK.

1. BANKS AND BANKING—BRANCHES OF NATIONAL BANKS.
   If the law of a State affirmatively grants authority to State
   banks to establish and operate branches, a national bank may
   likewise establish branches (12 USCA, § 36).

2. SAME—NATIONAL BANKS ARE INSTRUMENTALITIES OF THE FED-
   ERAL GOVERNMENT.
   National banks are instrumentalities of the Federal government,
   are subject to the paramount authority of the United States
   and only such State laws respecting their affairs as do not
   interfere with the purposes of their creation, tend to impair
   or destroy their efficiency as Federal agencies, or conflict
   with the paramount law (12 USCA, § 36).

3. SAME—AUTHORITY TO ESTABLISH NATIONAL BANK BRANCHES.
   National banks in Michigan have authority to establish branch
   banks only by virtue of statutory authority enacted by both
   the United States and the State of Michigan (12 USCA, § 36).

4. SAME—NATIONAL BANK BRANCHES—COMPETITION.
   In permitting a national bank to establish branches in States
   wherein State banks have "authority affirmatively and not
   merely by implication or recognition" to do so, it was in-
   tended to place both State and national banking systems upon
   an equal competitive plane (12 USCA, § 36).

5. WORDS AND PHRASES—"AFFIRMATIVE" DEFINED.
   An "affirmative" grant of authority is that which declares
   positively; that which avers a fact to be true; that which
   establishes; the opposite of negative.

6. BANKS AND BANKING—BRANCHES—FEDERAL AUTHORITY.
   Since State banks in Michigan may consolidate and with written
   permission of the State banking commissioner establish and
   operate as a branch or branches the consolidating bank or
   banks, equal privileges are available to national banks with
   the approval of the comptroller of the currency as the latter

banks, as corporate instrumentalities of the United States created for public purposes, need look only to the terms of the national bank act for guidance and approval of their actions (12 USCA, §§ 33, 36; Act No. 341, § 114, Pub. Acts 1937).

7. UNITED STATES—LIMITED POWERS.
The government of the United States, though limited in its powers, is supreme within its sphere of action.

8. BANKS AND BANKING—NATIONAL BANKS—STATE CONTROL.
The States can exercise no control over national banks, nor in any wise affect their operation, except in so far as Congress may see proper to permit.

9. SAME—NATIONAL BANK BRANCHES—APPROVAL OF COMPTROLLER OF THE CURRENCY.
The approval of the comptroller of the currency alone is required for the establishment and operation of branch banks of a national banking institution within this State and such branch banks may be established and operated to the same extent and subject to the same limitations as are State banks (12 USCA, §§ 33, 36; Act No. 341, § 114, Pub. Acts 1937).

10. SAME—NATIONAL BANKS—FIDUCIARIES.
Congress may empower the Federal reserve board to grant national banks the authority to act in fiduciary capacities (12 USCA, § 248 [k]; Federal Reserve Board Regulation F, § 3).

11. SAME—NATIONAL BANKS—INCIDENTAL PRIVATE BUSINESS—STATE CONTROL.
Where power has been granted a national bank by Congress to conduct private business operations, incidental to the successful discharge of its public functions either in cooperation with or as a part of such public functions, the power of a State to regulate such business or use its authority to prohibit such business from being united by Congress with the banking function would be excluded.

12. SAME—CONSOLIDATED NATIONAL BANK—FIDUCIARIES—STATUTES.
In view of provisions of State statute authorizing the empowering of State banks to act in various fiduciary capacities, for consolidation of State banks and trust companies and subsequent operation in fiduciary capacity by the consolidated institution and provisions of Federal statutes placing national banks upon an equal competitive footing with State banks, where some of the consolidating national banks had hitherto been authorized to operate in fiduciary capacities,

upon consolidation and continuance of former banks as branches, by operation of law each unit of the consolidated national bank had the right to exercise fiduciary powers (12 USCA, § 248 [k]; Federal Reserve Board Regulation F, § 3; Act No. 341, §§ 35, 104, 105, Pub. Acts 1937).

13. COSTS—PUBLIC QUESTION—NATIONAL BANK BRANCHES—FIDUCI-ARIES.

No costs are allowed in quo warranto proceeding to determine right of a consolidated national bank to operate branch banks within the State and also to function as a fiduciary, a public question being involved (12 USCA, §§ 33, 36, 248 [k]; Federal Reserve Board Regulation F, § 3; Act No. 341, §§ 35, 104, 105, 114, Pub. Acts 1937).

Herbert J. Rushton, Attorney General of the State of Michigan, on the relation of Frederick B. Elliott, Jr., State Banking Commissioner, filed an information in the nature of quo warranto to determine under what authority the Michigan National Bank operates branches in various cities and acts in fiduciary capacities in each city in which it operates. Submitted April 17, 1941. (Docket No. 66, Calendar No. 41,537.) Judgment of ouster denied June 30, 1941.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General, for plaintiff.

*Shields, Ballard, Jennings & Taber, Edmund C. Shields,* and *David R. Bishop,* for defendant.

CHANDLER, J. Quo warranto proceedings were instituted by the attorney general upon the relation of the commissioner of banking of the State of Michigan to inquire by what warrant the Michigan National Bank, a banking association organized under the laws of the United States with sole au-

thority to carry on operations of discount and deposit in the city of Lansing, exercises the privilege of operating branches in other cities and to act in fiduciary capacities in each of said cities contrary to the laws of the State of Michigan.

The answer of defendant to the information so filed establishes the following facts: Prior to December 31, 1940, six banks located in the cities of Battle Creek, Marshall, Grand Rapids, Port Huron, Lansing, and Saginaw were duly chartered and authorized by the comptroller of the currency of the United States to conduct a general banking business in Michigan in each of such cities. With the exception of the bank situated in Saginaw, all six institutions had been in existence as national banks for a number of years, and the Saginaw bank became such an institution by conversion from a State bank on June 1, 1940.

Desiring to consolidate, the stockholders and directors, proceeding in accordance with the provisions of the national bank act, 12 USCA, § 33, met and subsequently ratified and approved a contract of consolidation. Thereafter, the comptroller of the currency approved the consolidation, and on December 31, 1940, issued a certificate of consolidation by which the foregoing six banks were merged in the corporate name of ''Michigan National Bank'' under the charter of the Lansing National Bank with principal offices at Lansing, Michigan, and a capital of $3,134,000.

At the same time the comptroller issued certificates of approval, consent and authorization for the Michigan National Bank to establish and operate branches in the cities of Grand Rapids, Saginaw, Battle Creek, Port Huron and Marshall.

Prior to and at the time of the consolidation, the First National Bank & Trust Company of Grand

Rapids, the First National Bank of Battle Creek, and the First National Bank of Port Huron had been granted the right to exercise trust powers by the board of governors of the Federal reserve system pursuant to Federal statutes and regulations duly adopted by the board of governors. Defendant contends that by Regulation F, § 3, as amended, trust powers passed by operation of law to the consolidated bank, and by virtue thereof, authority exists to exercise such fiduciary powers in all of the cities named.

With the sanction of the comptroller of the currency, defendant has maintained branch banks and by virtue of the foregoing regulation of the Federal reserve board has exercised its fiduciary capacities in the cities of Grand Rapids and Port Huron since the first business day after its consolidation. Such action, defendant asserts, is in accordance with the provisions of the national banking act and the Michigan financial institutions act, and recourse to the commissioner of banking of the State for approval of such action is unnecessary since the comptroller of the currency of the United States has sole control over national banks.

What, then, are the statutory provisions relied upon to justify defendant's position?

The national bank act, 12 USCA, § 36, provides:

"A national banking association may, with the approval of the comptroller of the currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by

language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.''

If the statute law of this State affirmatively grants authority to State banks to establish and operate branches, a national bank, under the terms of the foregoing provisions, may likewise establish branches. Such authorization, defendant says, is present in the Michigan financial institutions act, being Act No. 341, Pub. Acts 1937 (Comp. Laws Supp. 1940, §§ 11897-1 to 11897-293, Stat. Ann. 1940 Cum. Supp. §§ 23.711–23.1136), entitled ''An act to revise and codify the laws relating to financial institutions as herein defined; to create a State banking department, and to prescribe its powers and duties; to provide for the incorporation of financial institutions, and their regulation and supervision by the State banking department; to prescribe penalties for violations of the provisions of this act; and to repeal certain acts and parts of acts inconsistent with the provisions of this act,'' which repealed Act No. 66, Pub. Acts 1929, as amended (3 Comp. Laws 1929, § 11898 *et seq.* [Stat. Ann. § 23.1 *et seq.*]), known as the general banking act. By section 34 it is provided:

''Any bank having a capital of at least fifty thousand dollars may establish and maintain branches within any village or city other than that in which it was originally chartered upon obtaining permission in writing from the commission.''

Section 114, upon which defendant principally relies, provides:

''Notwithstanding the provisions of any law to the contrary, any consolidated bank resulting from the consolidation of two or more State banks or

any one or more banks or trust companies, as provided for in section one hundred four of this act, and any State bank or national banking association which purchases the assets of a State bank, as provided for in section one hundred twelve of this act, may, with the written permission of the commission, establish and operate as a branch or branches the consolidated bank or banks or any bank which sells its assets to another State bank or national banking association, as provided in section one hundred twelve of this act: *Provided, however,* that the commission shall not grant such permission unless the unimpaired capital of the consolidated or purchasing bank or association is at least fifty thousand dollars, and the capital and surplus of such bank or association is in an amount at least equal to the aggregate minimum capital and surplus, respectively, required for the establishment of a bank in each of the various places where such bank or association and its branch or branches are to be located, and the commission is satisfied as to the sufficiency of the capital and surplus of such bank or association, and the necessity for the establishment of such a branch or branches, and the prospects of successful operation if established.''

Plaintiff takes the position that the two sections of the Michigan financial institutions act quoted create a conditional privilege which remains subject to the express conditions set forth including the provision that written permission of the commissioner of banking must be obtained; that before section 36 of the national bank act can be said to give national banks an absolute right to establish branches in a State, it should appear that the State law gives an unqualified or unconditional right to do so.   On the other hand, defendant contends that though the legislation does not permit unrestricted State-wide branch banking, a formula was

established authorizing branch banking if the branches result from the sale and purchase of bank assets of a going bank or the consolidation of two or more banks or trust companies. The question thus arises—Can two or more national banks located in different Michigan cities consolidate under the charter of one and operate the other consolidating banks as branches in Michigan without the written consent of the commissioner of banking of the State, but with the consent of the comptroller of the currency of the United States?

Before the enactment of 12 USCA, § 36, it was undoubtedly true that a national bank could not establish branch banks where prohibited by State legislation. Thus, in the case of *First National Bank in St. Louis* v. *State of Missouri* (1923), 263 U. S. 640 (44 Sup. Ct. 213, 68 L. Ed. 486), affirming *State, ex. rel. Attorney General,* v. *First National Bank of St. Louis,* 297 Mo. 397 (249 S. W. 619, 30 A. L. R. 918), proceedings in quo warranto were brought by the State of Missouri to determine defendant's authority to establish and conduct a branch bank in St. Louis contrary to provisions of a State statute (R. S. Mo. 1919, § 11737), providing "That no bank shall maintain in this State a branch bank or receive deposits or pay checks except in its own banking house."

In upholding the State's contention, the majority of the court, speaking through Mr. Justice Sutherland, said (p. 656):

"National banks are brought into existence under Federal legislation, are instrumentalities of the Federal government and are necessarily subject to the paramount authority of the United States. Nevertheless national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation,

tend to impair or destroy their efficiency as Federal agencies or conflict with the paramount law of the United States.''

The court concluded that the prohibition of branch banking did not frustrate the purpose for which the bank was created nor interfere with the discharge of its duties to the government, and that the national banking law as it then existed gave no authority to establish or maintain branch banks. ''This apparently was the interpretation of Congress itself, since in two instances at least special legislation was deemed necessary to allow the establishment of branch banks, viz: at the Chicago Exposition, in 1892, chap. 71, 27 Stat. at L. 33, and at the St. Louis Exposition, 1901, chap. 864, 31 Stat. at L. 1444, § 21, the existence of the branch bank in each instance being expressly limited to the period of two years.''   (p. 658.)

From this view Mr. Justice Van Devanter, with whom Chief Justice Taft and Mr. Justice Butler concurred, dissented upon the theory that the State is without capacity to bring or maintain the proceeding and the court below was without authority to entertain it.

''National banks are corporate instrumentalities of the United States created under its laws for public purposes essentially national in character and scope. Their powers are derived from the United States, are to be exercised under its supervision and can be neither enlarged nor restricted by State laws.''   (p. 662.)

''It is not claimed that the laws of the United States contain any provision whereby the privilege asserted by the bank is made to depend on the will or legislative policy of the State; nor do they in fact contain any such provision.  Whether the bank has

the privilege which it asserts is therefore in no way dependent on or affected by the State law, but turns exclusively on the laws of the United States. If they grant the privilege, expressly or by fair implication, no law of the State can abridge it or take it away. And if they do not grant it, they in effect prohibit it, and no law of the State can strengthen or weaken the prohibition. In either event nothing can turn on the State law. It simply has no bearing on the solution of the question." (p. 666.)

1 Cooley on Constitutional Limitations (1927, 8th Ed.), pp. 25, 26, note 2, cites *First National Bank in St. Louis* v. *State of Missouri, supra,* for the proposition:

"National banks, though instrumentalities of the Federal government and subject to the paramount authority of the United States, are nevertheless, subject to the laws of a State, unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as Federal agencies, or conflict with the paramount law of the United States."

"Except as authorized by express provisions of the national bank act, a national bank does not have power to establish a branch bank." 9 C. J. S. p. 1209, § 654, citing *First National Bank in St. Louis* v. *State of Missouri, supra.*

See annotations: Power of national banks to establish branches or maintain separate banking offices, 30 A. L. R. 927; 50 A. L. R. 1340.

Nor was legislative sanction given to State branch banking until 1933 when Act No. 66, § 4, Pub. Acts 1929, known as the general banking law, was amended.* Hence it was early held in this State that where, by charter, a bank was to be located at such place in the county of Oakland as a majority

* By Act No. 144, Pub. Acts 1933.—REPORTER.

of the stockholders should direct and it was located at the village of Pontiac, it was a violation of the charter to establish an agency in Detroit where nearly all the business of the institution was done. *Attorney General* v. *Oakland County Bank* (1842), Walk Ch. (Mich.) 90.

"By the act of the incorporation, the stockholders were authorized to locate the bank in the county of Oakland. It follows, therefore, that, if the corporation has undertaken to exercise any of its franchises without that county, it has usurped an authority in violation of law, and must suffer the penalty which the law inflicts." *People, ex rel. Attorney General,* v. *Oakland County Bank,* 1 Doug. (Mich.) 282, 288.

Such was the status of the law prior to the State and Federal legislation quoted at length above, legislation which must be held to change former concepts to conform to later views of the people as expressed through their representative assemblies.

That a national banking association may now have the right to establish and operate branches in a State, it must appear that State banks are authorized so to do "by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition and subject to the restrictions as to location imposed by the law of the State on State banks." (12 USCA, § 36.)

In view of the former holding of the United States supreme court, the meaning of this phraseology, worded with evident care and apparent skill, with its effect upon the present controversy, should not be decided without reference to the background giving rise to its final form. In a most careful and informative opinion, reported in 37 O. A. G. (U. S.) 325, 326–331 (1932–1934), replete with references to

the Congressional Record, Acting United States Attorney General J. Crawford Biggs traced the history of the foregoing language:

"Section 5155, R. S. originally authorized State banks, having branches to which definite portions of a joint capital were assigned, to become national banking associations and to retain such branches. This was amended by the act of February 25, 1927 (chap. 191, 44 Stat. at L. 1224, 1228), so as to provide, *inter alia,* that national banking associations might establish and operate branches within the city, town or village in which the association is situated if of not less than 25,000 population, provided that 'such establishment and operation are at the time permitted to State banks by the law of the State in question.'

"The Senate on May 6, 1932, began consideration of a bill reported by the committee on banking and currency with purpose to amend the law so as to authorize State-wide branch banking without regard to State laws or policies, and Senator Glass, the chairman of the committee, pointed out that the question was highly controversial and had been mooted over a period of years (75 Congressional Record, pp. 9711, 9890). The suggested provision, after much discussion, amendment and revision, finally emerged as it now appears in the act of June 16, 1933.

"The one outstanding objection to the proposal was characterized by the committee chairman as founded upon a view of the opponents that it would constitute 'an invasion of the sovereign rights of the States' for the Federal government to establish within their borders a species of banking not sanctioned by the local policy. The objections actually voiced by individual members were of such import and indicated a view that most States did not permit branch banking (75 Congressional Record, pp. 9890, 13002; vol. 76, pp. 1449, 1997, 2079, 2080, 2090, 2205, 2206).

"Senator Bratton offered an amendment to authorize branch banks only when 'permitted to State banks by the law of the State in question,' but acquiesced in a modification suggested by Senator Wheeler that 'authorized,' instead of 'permitted,' should be used, the latter explaining (76 Congressional Record, p. 1997):

" 'In the State of Montana and in a number of other States there is no law expressly either prohibiting or permitting State branch banking; but the State bank examiner has held that there is nothing in the charter of the State banks permitting a branch bank. Under that construction, in my humble opinion, branch banks could be established in that State unless they were expressly prohibited by the law of the State. Consequently, I wanted a provision to be placed in the statute that branch banks shall not be permitted in a State unless the legislature or the people themselves, through an initiative, actually by law say that they shall be permitted there.' * * *

"The Bratton amendment, modified to accord with the views of Senator Wheeler, prevailed and the bill passed by the Senate with the controversial provision reading as hereinafter indicated. (76 Congressional Record, pp. 2205, 2208, 2517). * * *

"The language approved by the Senate had provided for branch banks beyond city, town, or village limits 'if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question.' * * *

"The conference committee rewrote the section (77 Congressional Record, p. 5781) so as to authorize such branches 'if such establishment and operation are at the time authorized to State banks by the *statute* law of the State in question by *language specifically granting such authority affirmatively and not merely by implication or recognition.*' * * *

"Mr. Luce, one of the conferees on the part of the House, made this explanation (77 Congressional Record, p. 5895): * * * 'In the controversy over

the respective merits of what are known as unit banking and branch banking systems, a controversy that has been alive and sharp for years, branch banking has been steadily gaining in favor. It is not, however, here proposed to give the advocates of branch banking any advantage. We do not go an inch beyond saying that the two ideas shall compete on equal terms and only where the States make the competition possible by letting their own institutions have branches. In short, we say only that if a State invites the race, let the better horse win. That system which proves itself the better able to serve the people will in the end prevail.' * * *

"It had been stated repeatedly in the Senate that the words 'expressly authorized' required 'affirmative' legislative action by the States, but not with any apparent idea that this went to the form or phraseology of the State statutes. (76 Congressional Record, p. 2206). The words '*statute* law,' 'specifically,' 'not merely by implication or recognition' would appear to have peculiar application to a situation such as described by Senator Wheeler where branch banking was neither expressly authorized nor expressly prohibited and the authority might possibly be implied from the charter or from mere legislative silence. It might have application in a situation such as that described by the supreme court of California, in *Bank of Italy* v. *Johnson,*[*] as existing in some States in which branch banking is prohibited but the prohibition does not apply to branches previously established. Of course, I do not mean to suggest that these examples mark the limit of possible restrictive operation of the statute."

There is here no suggestion that an unqualified or unconditional right need be given by State law to State banks to establish and operate branches before national banks may do likewise without the

[*] 200 Cal. 1 (251 Pac. 784.)—REPORTER.

sanction of the administrating State banking office. Rather the thought was to place both banking systems upon an equal competitive plane. An affirmative grant of authority is "that which declares positively; that which avers a fact to be true; that which establishes; the opposite of negative." Black's Law Dictionary (3d Ed.), p. 75; *Hubbard* v. *Fort,* 188 Fed. 987, 996.

Plaintiff takes the basic position that where the Congress of the United States and a State legislature have, within concurrent spheres of regulation, enacted consistent statutes and the Congress has, as in this particular instance, expressly recognized the propriety of leaving to each State of the Union some reasonable measure of power to declare public policy on the same subject matter, they are to be construed as constituting harmonious systems, so long as they admit of no unjust discrimination which may not be checked by the courts, and that therefore approval of the commissioner of banking of the State must be sought and obtained before a national bank may establish or maintain branch banks.

Studying the development of the legislation under consideration a different result must be reached. The State has "by language specifically granting such authority affirmatively and not merely by implication or recognition" provided for State branch banking by State banks. Under Act No. 341, § 114, Pub. Acts 1937, State banks may consolidate and with the written permission of the commissioner of State banking establish and operate as a branch or branches the consolidating bank or banks. By the Federal enactment equal privileges are available to national banks with the approval of the comptroller of the currency. "Only where the States make the competition possible by letting their own institutions

have branches" are national banks to have branches. Having made the competition possible, national banks, as corporate instrumentalities of the United States created for public purposes, need look only to the terms of the national bank act for guidance and approval of their actions.

Thus, in the leading case of *M'Culloch* v. *State of Maryland,* 4 Wheat. (17 U. S.) 316 (4 L. Ed. 579), Chief Justice Marshall held unconstitutional an act passed by the State of Maryland seeking to tax all banks or branches thereof in the State not chartered by the legislature and making provisions for the use of stamped paper and the deposit of sums of money.

"If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action." (p. 405.)

"The act to incorporate the bank of the United States is a law made in pursuance of the Constitution, and is part of the supreme law of the land." (p. 424.)

In *Osborn* v. *Bank of the United States,* 9 Wheat. (22 U. S.) 738 (6 L. Ed. 204), an injunction issued precluding the auditor of the State of Ohio from proceeding against complainant under a State statute providing for the levy of a tax upon banks operating contrary to the laws of the State.

"The whole opinion of the court, in the case of *M'Culloch* v. *State of Maryland,* is founded on and sustained by, the idea that the bank is an instrument which is 'necessary and proper for carrying into effect the powers vested in the government of the United States.' It is not an instrument which

the government found ready made, and has supposed to be adapted to its purposes; but one which was created in the form in which it now appears, for national purposes. only." (p. 860.)

And where the national bank act of June 3, 1864 (13 Stat. at L. 99), provided that the knowingly taking, receiving, reserving, or charging a rate of interest greater than allowed by the act shall be held and adjudged a forfeiture of the entire interest which the note, bill or other evidence of debt carried with it, the interest only is forfeited, even though under the law of the State of New York where the action was brought usury avoids the entire debt. *Farmers' & Mechanics' National Bank* v. *Dearing,* 91 U. S. 29 (23 L. Ed. 196).

Said the court:

"The national banks organized under the act are instruments designed to be used to aid government in the administration of an important branch of public service. They are means appropriate to that end. Of the degree of the necessity which existed for creating them Congress is the sole judge.

"Being such means, brought into existence for this purpose, and intended to be so employed, the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Anything beyond this is 'an abuse, because it is the usurpation of power which a single State cannot give.' Against the national will 'the States have no power, by taxation or otherwise, to retard, impede, burthen, or in any manner control, the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.' *M'Culloch* v. *State of Maryland, supra; Weston* v. *Charleston,* 2 Pet. (27 U. S.) 449, 466 (7 L. Ed. 481);

*Brown* v. *Maryland,* 12 Wheat. (25 U. S.) 419 (6 L. Ed. 678); *Dobbins* v. *Erie County,* 16 Pet. (41 U. S.) 435 (10 L. Ed. 1022)." (pp. 33, 34.)

In *Davis* v. *Elmira Savings Bank,* 161 U. S. 275 (16 Sup. Ct. 502, 40 L. Ed. 700), it appeared that the Elmira National Bank, a national institution doing business in the State of New York, suspended payment and the comptroller of the currency of the United States appointed Davis as receiver. The Elmira Savings Bank, incorporated under the laws of New York, kept a deposit account with the national bank. After liquidating the affairs and obtaining the assets of the defunct bank all its circulating notes were provided for, and the receiver had on hand in cash for distribution among its creditors a sum exceeding the amount due to the State bank. Thereupon, the State bank demanded payment of the entire sum it had had on deposit in preference to the other creditors of the national bank, basing its demand upon the provisions of the general banking laws of the State of New York directing "The trustee, assignee or receiver" of "any bank or trust company which shall become insolvent" to apply the assets received by him, "in the first place to the payment in full of any sum or sums of money deposited therewith by any savings bank, but not to an amount exceeding that authorized" by law. The claim was resisted on the strength of the Federal statute directing the comptroller "from time to time, after full provision has been made for the refunding to the United States of any deficiency in redeeming the notes of such association, * * * to make a ratable dividend of the money paid over to him * * * on all such claims as may have been proved."

In holding the State law in conflict with the Federal statute and therefore void when applied to a national bank, the court said:

"National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt, by a State, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court." (p. 283.)

The conflict of State and Federal authority again arose in *Easton* v. *Iowa,* 188 U. S. 220 (23 Sup. Ct. 288, 47 L. Ed. 452), where defendant Easton was sentenced to imprisonment under the provisions of a State statute of Iowa for the offense of receiving, as president of a national bank, a deposit of a sum of money at a time when the bank was insolvent and when such insolvency was known to the defendant. On appeal to the United States supreme court, the decision was reversed, for a State is without power to make criminal laws applicable to banks organized and operating under the laws of the United States.

"That legislation has in view the erection of a system extending throughout the country, and independent, so far as powers are concerned, of State legislation which, if permitted to be applicable, might impose limitations and restrictions as various and numerous as the States." (p. 229.)

"Our conclusions, upon principle and authority,

are that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations; that Congress has directly dealt with the subject of insolvency of such banks by giving control of the secretary of the treasury and the comptroller of the currency, who are authorized to suspend the operations of the banks and appoint receivers thereof when they become insolvent, or when they fail to make good any impairment of capital; that full and adequate provisions have been made for the protection of creditors of such institutions by requiring frequent reports to be made of their condition, and by the power of visitation by Federal officers; that it is not competent for State legislatures to interfere, whether with hostile or friendly intentions, with national banks or their officers in the exercise of the powers bestowed upon them by the general government.'' (p. 238.)

And a State statute, providing for the escheat to the State of deposits in a bank after 20 years without being claimed upon failure of the depositor or claimant to file his residence with the bank, is void as against deposits in national banks. *First National Bank of San Jose* v. *State of California,* 262 U. S. 366 (43 Sup. Ct. 602, 67 L. Ed. 1030).

See *Tiffany* v. *National Bank of Missouri,* 18 Wall. (85 U. S.) 409 (21 L. Ed. 862); *Jennings* v. *United States Fidelity & Guaranty Co.,* 294 U. S. 216 (55 Sup. Ct. 394, 79 L. Ed. 869, 99 A. L. R. 1248); *Pierce* v. *Capital National Bank,* 270 Mich. 314. See, also, *Bank of Italy* v. *Johnson,* 200 Cal. 1 (251 Pac. 784); *First National Bank of Elizabethtown* v. *Commonwealth, for the use of Louisville School Board,* 143 Ky. 816 (137 S. W. 518, 34 L. R. A. [N. S.] 54, Ann. Cas. 1912 D, 378); 39 O. A. G. (U. S.) 469.

The conclusion reached after examining the foregoing authorities is that the approval of the comptroller of the currency alone is required for the establishment and operation of branch banks of a national banking institution within the State of Michigan and that such branch banks may be established and operated to the same extent and subject to the same limitations as are State banks.

This determination leaves unanswered the second question raised in this proceeding, namely, may the banks so consolidated and operated as branches under the charter of the Lansing National Bank with the title of Michigan National Bank exercise the fiduciary powers which had been granted to one or more of the consolidating banks by the Federal reserve board prior to consolidation, and which had been reaffirmed by the issuance of a certificate by the board of governors of the reserve board subsequent to consolidation?

The same principles which governed the determination of the question of authority to establish branch banks in the first instance are controlling.

12 USCA, § 248 (k), provides in part:

"The board of governors of the Federal reserve board shall be authorized and empowered: * * *

"(k) To grant by special permit to national banks applying therefor, when not in contravention of State or local law, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

"Whenever the laws of such State authorize or permit the exercise of any or all of the foregoing

powers by State banks, trust companies, or other corporations which compete with national banks, the granting to and the exercise of such powers by national banks shall not be deemed to be in contravention of State or local law within the meaning of this chapter.''

By Regulation F, § 3, issued under authority of the foregoing statutory enactment, it is provided:

''Where two or more national banks consolidate under the provisions of the act of Congress approved November 7, 1918, as amended, and any one of such banks has, prior to such consolidation, received a permit from the board of governors of the Federal reserve system to act in fiduciary capacities which is in force at the time of the consolidation, the rights existing under such permit pass by operation of law to the consolidated bank and the consolidated bank may act in such fiduciary capacities in the same manner and to the same extent as the bank to which such permit was originally issued; and no new application to continue to act in such capacities is necessary. However, in order that the records of the consolidated bank may be complete and that it may have convenient evidence of its right to exercise trust powers, the board, upon receipt of advice from the comptroller of the currency that the consolidation has been consummated, will issue a certificate to the consolidated bank showing its right to exercise the trust powers theretofore granted by the board to any of the national banks taking part in the consolidation.''

On January 17, 1941, the board of governors of the Federal reserve system issued such a certificate showing that the Michigan National Bank has authority to act, when not in contravention of State or local laws, as trustee, executor, administrator, registrar and in any other fiduciary capacity in which State banks, trust companies or other cor-

porations which come into competition with national banks are permitted to act under the laws of the State of Michigan.

Under the adjudications of the Supreme Court of the United States it must be conceded that Congress may empower the Federal reserve board to grant national banks the authority to act in fiduciary capacities. Thus, in the case of *First National Bank of Bay City* v. *Attorney General* (1917), 244 U. S. 416 (37 Sup. Ct. 734, 61 L. Ed. 1233), reversing *Attorney General, ex rel. Union Trust Co.,* v. *First National Bank of Bay City,* 192 Mich. 640, quo warranto proceedings were instituted upon the relation of five trust companies organized and doing business under the laws of the State of Michigan challenging defendant's right to act in a fiduciary capacity notwithstanding it had been granted permission by the Federal reserve board, pursuant to 38 U. S. Stat. at L. 251, so to act. In deciding favorably to plaintiff, the majority of the Michigan Supreme Court held that: "No State law is contravened—opposed, come into conflict with—because a corporation exercises the indicated powers, nor by the act of Congress creating national banks" (p. 651), but concluded that Congress exceeded its constitutional powers in granting to banks the right to act as trustees, executors, and administrators, and that such legislation constituted an invasion of State sovereignty.

The Supreme Court of the United States, however, pointed out that:

"In view of the express ruling that the enjoyment of the powers in question by the national bank would not be in contravention of the State law, it follows that the reference of the court below to the State authority over the particular subjects which the statute deals with must have proceeded upon the

erroneous assumption that because a particular function was subject to be regulated by the State law, therefore Congress was without power to give a national bank the right to carry on such functions. But if this be what the statement signifies, the conflict between it and the rule settled in *M'Culloch* v. *State of Maryland* and *Osborn* v. *Bank of the United States,* is manifest. What those cases established was that although a business was of a private nature and subject to State regulation, if it was of such a character as to cause it to be incidental to the successful discharge of a bank chartered by Congress of its public functions, it was competent for Congress to give the bank the power to exercise such private business in cooperation with or as a part of its public authority. Manifestly, this excluded the power of the State in such case, although it might possess in a general sense authority to regulate such business, to use that authority to prohibit such business from being united by Congress with the banking function, since to do so would be but the exertion of State authority to prohibit Congress from exerting a power which under the Constitution it had a right to exercise." (p. 425.)

This opinion was followed in *State of Missouri, ex rel. Burnes National Bank of St. Joseph,* v. *Duncan* (1924), 265 U. S. 17 (44 Sup. Ct. 427, 68 L. Ed. 881), reversing 302 Mo. 130 (257 S. W. 784), where the relator, appointed executor under a will, was denied letters testamentary on the ground that by the laws of Missouri national banks were not authorized to act as executors. This view was taken by the Supreme Court of the State but reversed on appeal. In commenting upon the act of September 26, 1918, chap. 177, § 2, 40 Stat. at L.

967, 968, amending section 11 (k), of the Federal reserve act, Mr. Justice Holmes said:

"This says in a roundabout and polite but unmistakeable way that whatever may be the State law, national banks having the permit of the Federal reserve board may act as executors if trust companies competing with them have that power." (p. 23.)

"The State cannot lay hold of its general control of administration to deprive national banks of their power to compete that Congress is authorized to sustain.

"The fact that Missouri has regulations to secure the safety of trust funds in the hands of its trust companies does not affect the case. The power given by the act of Congress purports to be general and independent of that circumstance and the act provides its own safeguards. The authority of Congress is equally independent, as otherwise the State could make it nugatory." (p. 24.)

"It is clear that the powers conferred on corporations in Wisconsin to act as trustees and other fiduciaries make these corporations rivals of the Commercial National Bank of Fond du Lac under the power conferred on it by the Federal reserve board and the acts of Congress. Under the circumstances the State must yield to the rights so conferred on national banks." *Estate of Stanchfield* (1920), 171 Wis. 553, 556 (178 N. W. 310).

Section 35 of the Michigan financial institutions act confers powers upon the State banking commission to grant "to any bank the power to act as trustee, executor, administrator, registrar of stocks and bonds, assignee, receiver, guardian of estates of minors, incompetent persons, or lunatics, and to act as agent for the transaction of business and the management of estates, or in any other fiduciary

capacity in which trust companies now or hereafter existing under the laws of this State may engage, with all the rights, privileges, powers, duties, and immunities conferred upon trust companies under the provisions of this act, except as herein otherwise provided."

By section 104 provision is made for the consolidation of State banks and trust companies, and by section 105 the consolidated institution by virtue of the consolidation holds and enjoys "every other fiduciary capacity, in the same manner and to the same extent as such rights, franchises and interests were held or enjoyed by any such consolidating institution at the time of such consolidation."

The exercise of fiduciary powers by the national banks in question, upon the basis of the foregoing cases and statutory provisions, is not in contravention of State or local law. On the contrary, the regulation of the Federal reserve board herein referred to and the Federal statutes place national banks upon an equal competitive footing with State banks. By operation of law, the right to exercise fiduciary powers passed to each unit of the consolidated bank. Accordingly, it follows that the defense of defendant to this proceeding is valid.

Judgment of ouster denied.

A public question being involved, no costs will be allowed.

Sharpe, C. J., and Bushnell, North, and Butzel, JJ., concurred with Chandler, J. Wiest, J., concurred in the result. Boyles, J., did not sit. McAllister, J., took no part in this decision.