

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

October 28, 1958

Honorable J. M. Falkner
Banking Commissioner
Capital National Bank Building
Austin, Texas

Re: Attorney General Opinion
No. WW-412

Dear Commissioner Falkner:

At the request of many interested banks we
have extensively reviewed Opinion No. WW-412 and have
concluded that it is a correct analysis of the law.

Therefore, this is to advise you that we do
not intend to alter the conclusions reached in the opinion.

Sincerely

WILL WILSON

WW:csb



April 9, 1958

Hon. J. M. Falkner          Opinion No. WW-412
Commissioner
Department of Banking       Re:  Are banking facilities of
Austin 14, Texas            various national banks main-
                            tained on federal military es-
                            tablishments and at Veterans
Dear Mr. Falkner:           Administration hospitals illegal?

        You have requested our opinion as to the legality
of the maintenance of banking facilities by various national
banks.  The issue raised concerns chiefly Article 3, Chapter
IX of the Texas Banking Code, as amended Acts 1957, 55th
Legislature, page 448, Chapter 220, Section 1 (Article 342-
903 V.C.S.), which prohibits state and national banks from
maintaining branch offices and from cashing checks or re-
ceiving deposits except in its own banking house.

        As we understand the facts, these facilities are
located in Texas on some eighteen different bases of the
Army, Navy and Air Force and at a Veterans Administration
hospital located in Temple, Texas.  These facilities pro-
vide services in accordance with the regulations of the Air
Force, Army and Navy, as the case may be.  (We assume the
Veterans Administration operation is substantially identical).
The following is a listing of the services as set out in the
applicable Air Force Regulation:

        "(1)  Provision for paying and receiving
    facilities for officers, airmen and civilian
    employees of the Department of the Air Force
    acting in their individual capacities.

        "(2)  Provision for paying and receiving
    facilities for custodians of non-appropriated
    funds of the Air Force, acting in such capa-
    city.

        "(3)  Furnishing cash to finance officers
    of the Air Force, including payroll require-
    ments when determined desirable.

"(4)  Accepting deposits for finance officers of the Air Force for credit to his official account with Treasurer of the United States.

"(5)  Selling savings bonds and stamps for cash.

"(6)  Selling banking paper, such as cashier's checks, bank money orders and travelers' checks.

"(7)  Redemption of savings bonds."

Article 3, Chapter IX of the Banking Code provides:

"Art. 3.  Branch Banking Prohibited.  No state, national or private bank shall engage in business in more than one place, maintain any branch office, or cash checks or receive deposits except in its own banking house. . ."  (Emphasis supplied).

In each case, these facilities are maintained separate and apart from the banking house of the respective national banks concerned.  The prohibition of the statute is clear and unambiguous as to the cashing of checks and receipt of deposits. It is immaterial that the facilities are located on military reservations on which the State of Texas may in some instances have ceded jurisdiction, for the prohibition runs against the parent banks which in each instance is clearly located within the state's jurisdiction.  It is unnecessary to decide whether the prohibition of the statute against engaging in business at more than one place or maintaining a branch office applies to the situation at hand, for the cashing of checks and receipt of deposits for and on behalf of military personnel and civilian employees in their individual capacities is clearly proscribed by Article 3, Chapter IX of the Banking Code.  Accordingly, the balance of this opinion will be limited to discussion of that activity.

The question has been raised as to the scope of the State's authority to regulate the activities of national banks. Can a state prohibit a national bank from engaging in branch banking activities?  We think this question was determined in the case of First National Bank in St. Louis v. State of Missouri, 263 U.S. 640 (1923), in which it was held that a national bank could not with impunity violate the state statute which provides that "No bank shall maintain in this state a

branch bank or receive deposits or pay checks except in its own banking house." Subsequent to the Court's decision in this case, Congress chose to enact the language now found in 12 USC 36, which reads as follows:

> "The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

> ". . .(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishments and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. . .

> ". . .(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent." (Emphasis supplied).

This language codifies the Court's decision in First National Bank in St. Louis v. State of Missouri, supra. An examination of the legislative history of 12 USC 36 clearly indicates that the purpose of the statute was to preserve to the states their right to prohibit national banking within their boundaries from engaging in any degree of branch banking. (See the remarks of Congressman Luce in the Debates of Congress, 77 Congressional Record, 5895). We are not unaware of the contrary language in two Michigan cases, (Rushton v. Michigan National Bank

298 Mich. 417, 299 N.W. 129 (Mich. Sup. 1941); Millard v. First National Bank of Detroit, 338 Mich. 610, 61 N.W.2d 804 (Mich. Sup. 1953)). In neither was review sought by the Supreme Court of the United States. At the time of Rushton v. Michigan National Bank, supra, the state statute authorized branch banks in certain instances. There was, therefore, the requisite state statutory authorization set forth in 12 USC 36. At the time of Millard v. First National Bank of Detroit, supra, the state statute did not apply to national banks Cases are therefore distinguishable. There is nothing in the legal authorities nor in the legislative history of the enactment of 12 USC 36 to indicate that Congress meant to limit in any way the decision of First National Bank in St. Louis v. State of Missouri, supra. Accordingly, it is our opinion that the state does have authority to prohibit national banks from engaging in branch banking.

The proponents of these branch facilities have submitted lengthy briefs which we have carefully considered. They contend that the state statute does not apply on the grounds that the facilities in question are being maintained as depositories of public money and as fiscal and financial agents of the United States government pursuant to 12 USC 90, and pursuant to an opinion of the Honorable Tom Clark when he was Attorney General of the United States with which you are familiar. (Opinion dated January 20, 1948, directed to the Secretary of Treasury and Secretary of the Army). A careful scrutiny of this opinion will show at the outset that it does not authorize the cashing of checks or receipt of deposits on behalf of military personnel and civilian employees in their own individual capacities, although it does authorize the maintenance of some of the other types of services set out above.

We are aware of the language in the opinion of the Federal District Court for the Northern District of Texas in United States v. Papworth, 156 Fed. Sup. 842, (November 11, 1957), presently on appeal to the Court of Appeals for the Fifth Circuit to the effect that the branch facilities maintained on Carswell Air Force Base cannot be regulated by the State because the facility is designated as a fiscal and financial agent of the United States and a depository of public money. A careful reading of the case will show that the language alluded to was clearly unnecessary to the holding of the case and is therefore dictum. Furthermore, the question of whether or not the bank, in cashing checks and receiving deposits for military and civilian personnel acting in their own individual capacity, was acting within the scope of its

agency or authority as depository of the United States or as a fiscal or financial agent of the United States, was not in issue.

There is nothing in the language or legislative history of 12 USC 90 or of any other applicable federal statute, or in the legal authorities, that indicates that the cashing of checks and receipt of deposits for individuals falls within the scope of authority of a national bank acting as a fiscal or financial agent of the United States. Historically, the activities of a fiscal and financial agent have been limited to transactions which are for the monetary and fiscal benefit of the United States, such as the purchase of gold or silver, the redemption of specie, and the funding of loans for the United States. Clearly, the activities of national banks in cashing checks and receiving deposits for individuals does not create such a monetary or fiscal benefit for the United States government. Obviously, in conducting such activities, the banks are not acting as depositories of public money. Furthermore, in conducting such transactions the banks are not acting on behalf of the United States in the sense that an agent acts on behalf of his principal for these transactions are for the direct benefit of the individuals concerned. Thus, the cashing of checks and receiving of deposits by military and civilian personnel in their individual capacities cannot be said to fall within the scope of any agency or function that national banks are bound to perform pursuant to 12 USC 90 or any other statute using similar verbiage.

Even if the transactions in question did fall within the scope of such an agency, your attention is directed to the fact that the present language of 12 USC 36 was enacted in 1927, subsequent to enactment of 12 USC 90. It was therefore a limitation upon the methods and means national banks could employ in performing the functions authorized or required by law. It prohibits these functions from being carried out by the means of "branches" as that term is defined in 12 USC 36. Therefore, by no reasonable construction can 12 USC 90 be said to override the provisions of 12 USC 36 which preserves to the states their historic right to prohibit the activities described in accordance with the holding of First National Bank in St. Louis v. State of Missouri, supra.

## SUMMARY

The maintenance by national banks which
have their main banking houses located in the
State of Texas of additional and separate of-

fices on military reservations and at Veterans Administration hospitals, at which checks are cashed and deposits received on behalf of military personnel or civilian employees in their individual capacities, is illegal by virtue of Article 3, Chapter IX of the Texas Banking Code, as amended.

Very truly yours,

WILL WILSON
Attorney General of Texas

Wallace P. Finfrock
Assistant

WPF:nh

APPROVED:

OPINION COMMITTEE:
Geo. P. Blackburn, Chairman
C. K. Richards
Houghton Brownlee, Jr.
Lawrence Jones

REVIEWED FOR THE ATTORNEY GENERAL
BY: W. V. Geppert