**OLD KENT BANK AND TRUST COMPANY, Appellant,**

v.

**William McC. MARTIN, Jr., individually and as Chairman of the Board of Governors of the Federal Reserve System, et al., Appellees.**

**No. 15244.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 26, 1960.

Decided April 28, 1960.

Petition for Rehearing Denied
Sept. 9, 1960.

Circuit Judge Washington would grant rehearing.

Mr. Gerhard A. Gesell, Washington, D. C., with whom Messrs. Henry T. Rathbun and Hamilton Carothers, Washington, D. C., were on the brief, for appellant.

Mr. John G. Laughlin, Jr., Atty., Dept. of Justice, with whom Asst. Atty. Gen. George C. Doub and Messrs. Oliver Gasch, U. S. Atty., and Samuel D. Slade, Atty., Dept. of Justice, were on the brief, for appellees.

Mr. James F. Bell, Washington, D. C., filed a brief on behalf of National Association of Supervisors of State Banks, as amicus curiae, urging reversal.

Before EDGERTON, WASHINGTON and DANAHER, Circuit Judges.

EDGERTON, Circuit Judge.

Appellant is a State bank and a member of the Federal Reserve System. It was formed by a merger or consolidation, "under the charter" of a predecessor State bank and under State law, between that predecessor and a national bank. It proposes to operate branches that were operated, until the merger, by the national bank.

Section 9 of the Federal Reserve Act, as amended, provides: "* * * Upon the merger or consolidation of a national bank with a State member bank under a State charter, the membership of the State bank in the Federal Reserve System shall continue. * * * The approval of the Board [of Governors of the Federal Reserve System] shall * * * be obtained before any State member bank may establish any new branch * * *." 66 Stat. 633, 12 U.S.C.A. § 321 (1958 ed.).

The Board has disapproved appellant's operation of the branches formerly operated by the national bank, on the ground that this would have an "adverse effect * * * on competition * * *." Appellant asked the District Court for a declaratory judgment that the Board's disapproval is not within its statutory authority and is illegal. This appeal is from a summary judgment for the Board.

We think the court erred. In our opinion the statutory word "establish" does not include "operate after acquiring by merger", and the statutory phrase "any new branch" of a State member bank does not include "any existing branch of a national bank that merges with a State member bank." In short, we think a State bank does not "establish any new branch" when it retains the branches it has acquired by merger.

The Board is not, and does not claim to be, authorized to prevent the merger of the two banks. It should follow, in

the absence of clear language to the contrary, that the Board has no authority to prevent the incident of merger which is involved here. We find no such contrary language. Moreover, the Federal Reserve Act provides that when a national banking association merges or consolidates with a State bank under a State charter, "the resulting State bank shall be considered the same business and corporate entity as the national banking association, although as to rights, powers, and duties the resulting bank is a State bank." 64 Stat. 456, 12 U.S.C.A. § 214b (1952 ed.). If Congress had meant to require "the same business and corporate entity as the national banking association" to get the Board's approval in order to continue operating the association's branches, we think Congress would have said so.

Reversed.

WASHINGTON, Circuit Judge (dissenting).

Section 9 of the Federal Reserve Act, 38 Stat. 259 (1913), as amended, 12 U.S. C.A. § 321, provides in pertinent part that no state bank which is a member of the Federal Reserve System or seeks membership therein may remain in or join the System

"except upon relinquishment of any branch or branches established after February 25, 1927, beyond the limits of the city, town, or village in which the parent bank is situated: *Provided, however, \* \* \* that the approval of the Board of Governors of the Federal Reserve System,* instead of the Comptroller of the Currency, *shall be obtained before any State member bank may hereafter establish any branch \* \* \*.*" (Emphasis supplied.)

The thrust of the statute is prohibition: the proviso permits branch banks only when specifically authorized in advance by the Federal Reserve Board. Clearly, the approval of the Board must be obtained before the member bank begins to operate any branch which it had not previously operated.[1] The Board has always so read the statute. It has con-

---

1. The full text of the pertinent provisions of Section 9 (Section 321 of 12 U.S.C.A.) is as follows:

"Upon the merger or consolidation of a national bank with a State member bank under a State charter, the membership of the State bank in the Federal Reserve System shall continue.

"Any such State bank which on February 25, 1927, has established and is operating a branch or branches in conformity with the State law, may retain and operate the same while remaining or upon becoming a stockholder of such Federal reserve bank; but no such State bank may retain or acquire stock in a Federal reserve bank except upon relinquishment of any branch or branches established after February 25, 1927, beyond the limits of the city, town, or village in which the parent bank is situated: *Provided, however,* That nothing herein contained shall prevent any State member bank from establishing and operating branches in the United States or any dependency or insular possession thereof or in any foreign country, on the same terms and conditions and subject to the same limitations and restrictions as are applicable to the establishment of branches by national banks except that the approval of the Board of Governors of the Federal Reserve System, instead of the Comptroller of the Currency, shall be obtained before any State member bank may hereafter establish any branch and before any State bank hereafter admitted to membership may retain any branch established after February 25, 1927, beyond the limits of the city, town, or village in which the parent bank is situated. The approval of the Board shall likewise be obtained before any State member bank may establish any new branch within the limits of any such city, town, or village (except within the District of Columbia)."

The branch banking paragraph of Section 321 thus distinguishes between "any branch or branches established after February 25, 1927, *beyond* the limits of the city, town, or village in which the parent bank is situated" and "any *new* branch [established] *within* the limits of any such city, town, or village." (Emphasis supplied.) For the purposes of this appeal, I do not believe that the distinction is important, and I think my colleagues mistakenly rely on the phrase "any new branch."

sistently ruled that the statute, to be effective, must cover every means of setting up additional branches—including the obvious device of merging with other banks. Realistically, Old Kent Bank has established new and additional branches by merging with Peoples National Bank. Certainly this must be true of the former main office of Peoples—once the headquarters of an independent bank, and now a mere branch of its one-time competitor, Old Kent. To me it is equally true of the former branch offices of Peoples. I think the majority, in reaching a contrary conclusion, ignores not only the realities of the situation and the plain language of the statute, but also its historical background.

There has long been public hostility to the extension, by means of branches, of a bank's geographic area of operation. At one time branch banking was almost uniformly forbidden in the states of the United States. Many persons feared and still fear that, among other things, unrestrained branch operations would enable a few wealthy urban banks to extend their operations to a point where the independence and prosperity of poorer banks doing business solely in communities remote from the great centers of commerce would be seriously jeopardized.[2] There is no reason to believe that any particular method of adding branches—by merger, purchase, or internal expansion—has ever been considered worthy of special approbation. In fact, from the viewpoint of those who have opposed branching, merger is an especially pernicious threat to local single-unit banks since not only does a competing bank thereby extend the scope of its operations but it also increases the amount of its capital. The congressional approach to these problems has been characterized by two long-established policies: (1) that state member banks and national banks should be given equal

treatment within the Federal Reserve System, and (2) that branch banking requires close control and regulation, in view of its far-reaching competitive consequences.

Since 1927, Congress has sought to effect a uniform policy toward branch banking by all members of the Federal Reserve System. The branch banking paragraph was originally added to Section 9 by the McFadden Act of 1927, 44 Stat. 1229—fourteen years after the establishment of the Federal Reserve System. During the life of the System prior to 1927, national banks had no authority to operate branches, and branch banking by state member banks existed through the sufferance of only a few state laws. By Section 7 of the McFadden Act of 1927, Congress authorized national banks to operate branches on a limited basis in those states which permitted branch banking and by Section 9 restricted branch banking by state member banks, notwithstanding that state law permitted more extensive branch operation. In amended form, Section 7 is now found in 12 U.S.C.A. § 36. With respect to state member banks, the McFadden Act changed Section 9 of the Federal Reserve Act to permit the continued operation of existing branches but required the "relinquishment of any branch or branches established after [February 25, 1927] beyond the limits of the city, town, or village" in which the parent state member bank was located. 44 Stat. 1229. In amended form the branch banking provisions of the Federal Reserve Act are codified in 12 U.S.C.A. § 321. Since national banks were allowed to establish branches only *within* the limits of the city, town, or village of the parent bank, all Federal and state banks in the Federal Reserve System were accorded substantially equal treatment under the McFadden Act. Amendments thereafter to Section 9 of

2. See, generally, Bradford, The Legal Status of Branch Banking in the United States (1940); Westerfield, Historical Survey of Branch Banking in the United States (1939); Annotation 136 A.L.R. 471 (1942) (collecting cases on branch banking); Annotation 50 A.L.R. 1340 (1927) (same); Annotation 30 A.L.R. 927 (1924) (same). See, also, New York Times, March 25, 1960, p. 37, col. 6.

the Federal Reserve Act purported to clarify the 1927 Act by making branch operations of state member banks subject to the Board's jurisdiction. These amendments did not define "establish," but gave the Board's jurisdiction over branch operations by state member banks the same scope as that exercised over national banks by the Comptroller of the Currency under 12 U.S.C.A. § 36. See § 5(a) (b) of the Act of June 16, 1933, 48 Stat. 164; §§ 203(a), 338 of the Act of August 23, 1935, 49 Stat. 704. 721.[3]

In indirectly defining the Board's jurisdiction over branch banks under Section 321, 12 U.S.C.A. § 36 also gives no express definition of "establish." Certainly a branch added through internal expansion comes within the term "establish," and no basis exists for reaching a different result with respect to branches acquired by purchase or merger. Appellants concede, moreover, that under Section 36(c) the Comptroller has jurisdiction to approve the operation of branches which national banks acquired by merger if the branches were not in operation on February 25, 1927. This concession is well made.[4] The language of Sections 36(b) and (c) supports this view by providing in pertinent part:

"§ 36.  Branch banks.

\*       \*       \*       \*       \*

"(b) If a State bank is after February 25, 1927, converted into or consolidated with a national banking association, or if two or more national banking associations are consolidated, such converted or consolidated association may, with respect to any of such banks, retain and operate any of their branches which may have been in lawful operation by any bank on February 25, 1927.

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches \*  \*  \*."

In the context of Section 36(b), the word "new" in subsection (c) must refer to the period of time after February 25, 1927, and the word "establish" must refer to the manner of acquisition. Thus, the word "establish" must provide the Comptroller's authority over acquisitions by merger and this word must confer the same authority on the Federal Reserve Board under Section 321.[5]

Finally, there is no indication in the legislative history that Congress, when in 1950 it authorized national banks to merge into state banks for the first time, believed that the Federal Reserve Board would not exercise jurisdiction over branches acquired by a state member bank through merger with a national bank. By the Act of August 17, 1950, 64 Stat. 455, Sections 214–214c were added to 12 U.S.C.A., and 12 U.S.C.A. § 321 was amended. Sections 214–214c for the first time permitted national banks to merge into state banks. Section 321 was amended to recognize this new possibility and to provide for the admission or continued membership of the resulting state bank in the Federal Reserve System. No changes were made in the branch banking paragraph of Section 321. Nor is there any indication that Congress intended to abandon its policy of according similar treatment to all Fed-

---

3. The congressional intent to make the jurisdiction of the Federal Reserve Board over the branches of state member banks co-extensive with the Comptroller's authority over national bank branches is further evidenced by the fact that amendments to the branch banking paragraph of Section 9 of the Federal Reserve Act and Section 7 of the McFadden Act of 1927 were at all times enacted concurrently.

4. See 36 Ops.Atty.Gen. 116 (1929); cf. Rushton ex rel. State Banking Com'r v.

Michigan National Bank, 1941, 298 Mich. 417, 418, 299 N.W. 129, 130, 136 A.L.R. 458. See, also, 37 Ops.Atty.Gen. 325 (1933).

5. No claim is made that the jurisdiction which the Comptroller has exercised over merger acquisitions has ever been successfully contested and no evidence has been offered as to whether or not the Federal Reserve Board has approved operation of branches which a state bank acquires through merger with another state bank.

eral Reserve members. In concluding otherwise the majority seems to assume that branch operations are the normal incidents of bank mergers. To me, acquiring and operating new branches without permission, in the manner here presented, is by no means a normal or inevitable incident of a merger. The operation of a branch bank is merely a method of doing business. And the transaction of merging two enterprises primarily creates a new aggregation of capital: it does not automatically put the stamp of approval upon particular methods of doing business. It certainly cannot mean that methods of doing business previously followed separately by the merging enterprises are necessarily legal and proper when followed by the new aggregation. The whole history of the antitrust laws is to the contrary.

In prosperous times such as these, branching may appear to some to be an ordinary and necessary incident of a bank merger. But it is well to remember that many states forbid branch banking altogether. And in times of hardship, merger may well be aimed at averting insolvency. Thus, branches may be closed instead of opened. Moreover, many other advantages besides branching may motivate the decision to merge, and one of these—the tax advantage—was in the forefront of the 1950 amendment to our banking laws. S.Rep. No. 1104, 81st Cong., 2d Sess. (1950). I cannot conclude, as does the majority, that the congressional intent to open up some benefits of merger constituted an abandonment of the older congressional policy of putting special restrictions on branch banking, applicable equally to state and national member banks of the Federal Reserve System. The history of the public controversy over branch banking, the intent of Congress to treat all Federal Reserve members alike, and the past practices of the Federal Reserve Board and the Comptroller of the Currency convince me that the majority misreads the intent of Congress in finding "that the Board has no authority to prevent the incident of merger which is involved here." I see no basis, therefore, for concluding that

the 1950 amendments should be interpreted so as to deprive the Board of jurisdiction with respect to the newly-created possibility that a state bank may add branches through merger with a national bank. I would uphold the asserted authority of the Board to disapprove the branch bank acquisitions involved in the present case.

As the majority denies all authority to the Board on the facts in this case, I do not need, perhaps, to enter into a full discussion of the standards which I think the Board should apply to it. But the parties have argued the matter to us, with particular reference to whether or not—assuming the Board has jurisdiction—it can properly apply antitrust considerations in determining the issue of approval *vel non*. I think it can, for reasons which may be briefly set out.

Appellant urges that the only standards on which the Board may act are those contained in 12 U.S.C.A. § 322, which reads:

> "In acting upon such application the Board of Governors of the Federal Reserve System shall consider the financial condition of the applying bank, the general character of its management, and whether or not the corporate powers exercised are consistent with the purposes of this Act."

Section 322 was not a part of the original Federal Reserve Act. See 38 Stat. 259 (1913). It was added, in 1917, in a slightly different form from its present one. See 40 Stat. 232 (1917). At that time, however, Section 9 of the Act (12 U.S.C.A. § 321) contained no restrictions on the operation of branches by state banks.

The history of the branch banking amendments to the Federal Reserve Act does not suggest that the Board's criteria for approving branch banks were to be limited to those expressed in Section 322 —if indeed Section 322 is in any way relevant. When the branch banking paragraph was added to the Federal Reserve Act in 1927, there was no need for a reference to standards such as Sec-

tion 322 contains. The 1927 amendment conferred no discretion on the Federal Reserve Board. Existing branches were expressly approved; future out-of-town branches were forbidden, and the Section was silent on new in-town branches. Thus, Section 322 was not originally pertinent to the branch banking paragraph.

Discretionary jurisdiction over out-of-town branches was first conferred on the Comptroller of the Currency in 1933 and then transferred to the Board in 1935. Act of June 16, 1933, 48 Stat. 189; Act of August 23, 1935, 49 Stat. 721. Neither the 1933 nor the 1935 amendments made reference to any standards except to the extent that they purported to adopt the same standards as are applied by the Comptroller of the Currency in approving branches under 12 U.S.C.A. § 36.

The only express standards specified under Section 36 of Title 12 were and are the standards found in state statutes. The McFadden Act provided in pertinent part:

"(c) A national banking association may, after the date of the approval of this Act, establish and operate new branches within the limits of the city, town, or village in which said association is situated if such establishment and operation are at the time permitted to State banks by the law of the State in question.

"(d) No branch shall be established after the date of the approval of this Act within the limits of any city, town, or village of which the population by the last decennial census was less than twenty-five thousand. No more than one such branch may be thus established where the population, so determined, of such municipal unit does not exceed fifty thousand; and not more than two such branches where the population does not exceed one hundred thousand. In any such municipal unit where the population exceeds one hundred thousand the determination of the number of branches shall be within the discre-

tion of the Comptroller of the Currency." 44 Stat. 1228.

Thus, as of 1927, the Comptroller exercised full discretion only where the home town of the national bank was larger than 100,000. Of course, in all situations it was the Comptroller's responsibility to determine for himself whether or not state law was hospitable. Cf. Rushton ex rel. State Banking Com'r v. Michigan National Bank, 1941, 298 Mich. 417, 299 N.W. 129.

The discretion conferred by the McFadden Act with respect to branch banking in cities over 100,000 was extended in 1933 and 1935 to permit the Comptroller to determine the appropriateness of national bank branches in communities of all sizes regardless of whether or not the national bank's home office was located in the community. The sole restrictions on this discretion were, again, that state law be hospitable and that certain capital prerequisites and limitations on the operation of "seasonal agencies" be met. *Compare* 48 Stat. 189 (1933); 49 Stat. 708 (1935) *with* 12 U.S.C.A. § 36(c). It is to be noted that the discretionary authority of the Board, co-extensive with that of the Comptroller over national banks, was first extended to state member banks at that time. See 48 Stat. 164 (1933); 49 Stat. 721 (1935). The amendment to Section 321, enacted on July 15, 1952, 66 Stat. 633, did not alter the character of the discretion to be exercised by the Comptroller or the Board.

What were the considerations relevant to the exercise of this discretion? In the various statutes which, over the years, have governed branch banking by members of the Federal Reserve System, Congress has imposed limits on the discretion of the Board and Comptroller by denial rather than, as in many other regulatory schemes, by express statement of positive factors which each authority must consider. Thus, under the McFadden Act capital restrictions were imposed and the number of branches which could be established in cities of certain sizes was specified. Later, Congress aban-

doned specification of the precise number of branches which could be established in communities and left the problem of the allowable number of branches to the unfettered discretion of the approving authority. With respect to national banks this is clearly true because national banks have no authority to operate branches except as expressly given by statute—by 12 U.S.C.A. § 36. Section 36 is primarily a grant of authority to national banks, not a limitation of the Comptroller's authority. Since 12 U.S.C.A. § 321 incorporates the policy of Section 36, the Board's discretion over state member banks must be construed as broadly as that of the Comptroller of the Currency.

In any event, it seems clear to me that Congress did intend the discretion of the Comptroller and the Board to extend to competitive considerations. One of the historic bases of the Federal banking structure has been a hostility to branch banking. Economically, this hostility is directed, among other things, against the competitive advantage which banks operating branches have over unit banks (banks without branches). And the specific restrictions which Section 36 has from time to time contained reflect this concern. To the extent that branching has been permitted at all in the Federal system, it has resulted as much from the necessity of protecting national banks from the competition offered by state banks permitted by state law to operate branches as from a congressional desire to assure the blessings of branch banking to communities where that sort of banking could be useful. At a minimum, many of those limitations which Congress has placed on branch banking, and a primary reason for committing to a Federal official the authority of Federal Reserve System banks to operate branches, stem from congressional awareness of the anti-competitive evils which can flow from unrestricted branch banking.[6]

The antitrust laws reflect an important aspect of congressional policy—the preservation of competition. Courts should be reluctant to interfere with an implementation of that policy by regulatory agencies, absent some clear intimation from Congress that a particular sort of business—or way of doing business—is to be exempted. "The fact that a policy against monopoly has been made the subject of criminal sanction by Congress as to certain activities does not preclude an administrative agency charged with furthering the public interest from holding the general policy of Congress to be applicable to questions arising in the proper discharge of its duties." Mansfield Journal Co. v. Federal Communications Commission, 1950, 86 U.S.App.D.C. 102, at page 107, 180 F.2d 28, at page 33.

---

6. See, generally, the authorities cited in note 2, above.