PEOPLES BANK-TRENTON, a Michigan Banking Corporation, Plaintiff,
National Bank of Wyandotte, a National Banking Association, Intervening Plaintiff,

Security Bank, a Michigan Banking Corporation, Intervening Plaintiff,

v.

James J. SAXON, as Comptroller of the Currency of the United States of America,
and
Manufacturers National Bank of Detroit, a National Banking Association, Defendants.

Civ. A. Nos. 26166, 26167.

United States District Court
E. D. Michigan, S. D.

May 14, 1965.

Raubolt, MacDonald & Dodge, by Raleigh R. Raubolt, Trenton, Mich., and Foster, Campbell, Lindemer & McGurrin, Lansing, Mich., by Richard B. Foster and Theodore W. Swift, Lansing, Mich., of counsel, for plaintiff.

Richard W. Look, Wyandotte, Mich., for intervening plaintiff National Bank of Wyandotte.

Harry F. Vellmure and Victor Mitea, Allen Park, Mich., for intervening plaintiff Security Bank.

Irwin Goldbloom, Attorney, Justice Department, and David E. Rapoport, Attorney, Office of Comptroller of Currency, for defendant James J. Saxon, Comptroller.

Bodman, Longley, Bogle, Armstrong & Dahling, by Carson C. Grunewald and James Baysinger, Detroit, Mich., for defendant Manufacturers Nat. Bank of Detroit.

MACHROWICZ, District Judge.

By stipulation of the parties hereto Civil Actions Nos. 26166 and 26167 were consolidated and heard together. In action No. 26166 James J. Saxon as Comptroller of the Currency of the United States of America, is the defendant. The plaintiffs seek a declaratory judgment providing that the approval by him of an application by the Manufacturers National Bank of Detroit for the establishment of a branch in Brownstown Township, Wayne County, Michigan was in violation of Title 12 U.S.C. § 36, and that the issuing by the Comptroller of a certificate evidencing said approval was void ab initio; that the said certificate be vacated, set aside as naught, and that the Comptroller be enjoined from enforcing, implementing, approving or otherwise recognizing the certificate as lawful, legal, valid or operative.

In action No. 26167, the Manufacturers National Bank of Detroit, a National Banking Association, is the defendant. The plaintiffs seek the same relief, namely, a declaratory judgment similar to that in action No. 26166, and an injunction restraining the defendant Bank from exercising any right or privilege purported to have been granted by the Comptroller by virtue of said allegedly void certificate, and from continuing the establishment or operation of the branch bank under purported authority of the certificate.

The Court took testimony at a hearing for a temporary injunction and during the course of said proceedings, the parties stipulated that the proceedings therein taken could be considered as a permanent record on final hearing, and that a final determination be made by the Court on the basis of the evidence so produced. It was also stipulated by all parties that the area in question be visited by the trial Judge in the company of attorneys on both sides. This was in fact done.

FINDING OF FACT

1. On July 3, 1964, the defendant Bank applied to the defendant Comptroller of the Currency for a certificate of authority to establish a new branch bank at the intersection of Telegraph Road (U.S.–24), Toledo-Dix Highway (U.S.–25) and West Road in an unincorporated portion of the Township of Brownstown, County of Wayne, State of Michigan. A "Summary of Information" containing twenty-five (25) pages and twelve (12) exhibits were submitted by the applicant Bank on July 24, 1964.

2. The plaintiff Peoples Bank of Trenton filed with the defendant Comptroller a letter of protest on July 17, 1964, the intervening plaintiff, Security Bank of Lincoln Park on July 18, 1964, and the intervening plaintiff, National Bank of Wyandotte on July 21, 1964.

3. On August 7, 1964, a representative of the defendant Comptroller made a tour of the area in question and that surrounding it in the company of an officer of the defendant Bank.

4. On December 4, 1964, the defendant Comptroller approved the application and on December 8, 1964, notified the applicant Bank by mail of the approval. On December 14, 1964, in response to a telephone call from defendant Bank requesting permission to open the branch, the Comptroller authorized the opening by a telegram.

5. On December 15, 1964, the defendant Bank commenced operation of the

branch in a trailer, in which it is still operating on a temporary basis.

6. On December 15, 1964, the plaintiffs first learned of the approval and of the opening of the branch Bank and commenced their action three (3) days later, on December 18, 1964.

7. An application to the State Banking Commissioner filed by the Trenton State Bank for a branch bank at a location approximately one-half (½) mile east of the disputed branch site of the defendant Bank, was denied on September 25, 1964, for failure to show either necessity or that the area constituted an unincorporated village.

8. The area covered by the application of the defendant Bank for a certificate, and by the certificate itself covered what is alleged to be an unincorporated village within certain defined boundaries. It is a three-square mile area with 360 homes, 36 business places and a population of 1,330 persons.

9. The homes are not in one cluster, but in three separate gatherings of homes, which can be described as the "Carter Road Sub" or "Telegraph Acres", the Joyce Road section and the Van Tel Park Subdivision.

10. The "Carter Road Sub" or "Telegraph Acres" is in the northern center of the "unincorporated village" and consists of from 75 to 103 houses, most of which are about eighteen (18) years old. There are no sidewalks or paved streets, and water is served by the village of Flat Rock.

11. The Joyce Road section is in the approximate geographical center of the "village" area. It contains approximately 30 to 68 houses.

12. The Van Tel Park Subdivision is near the southern boundary of the village and contains 43 to 59 houses.

13. The remaining homes are scattered throughout the area. In the last two years a total of only six to eight homes have been built in the entire area.

14. The area contains 30 to 36 businesses or commercial establishments. Of these 5 offer lodging as motels or tourist homes, 4 are gasoline stations, 3 taverns or beer-gardens, 2 restaurants, 4 retail food stores, 2 nurseries, 3 building, moving or manufacturing establishments. The other commercial establishments are a beauty shop, a home-operated insurance agency, a plumbing or hardware store, a brick crete concern, a swap shop, an India herb clinic, a bottled gas distributor, a poulterer, an antique shop, an equipment rental concern, a drive-in movie, and an aluminum siding sales office. The volume of the business of these establishments is in dispute, but with the exception of one, (a machine shop, employing about 25 people,) none employ more than 5 people.

15. A poll taken by the defendant Bank purports to indicate that 18.8% of the people in the area do none of their shopping therein, 67.1% do some, and 14.1% do most of their shopping in the area.

16. There are from 6 to 10 abandoned commercial buildings along the main highways in the area, US–24 and US–25, including three gasoline stations, one being located at the intersection where the disputed branch Bank is open, having been in operation at the time of the filing of the application but closed before approval was granted.

17. The area contains no Town Hall, Community Center, Township office or installation or post-office. There is no school or church in the area, though there is one school just over the boundary. There are no shopping centers, professional office buildings nor do any professional men, such as doctors, dentists, lawyers, osteopaths, chiropractors or real estate salesmen have their offices located in the area. There is no appliance store, general store, clothing store or barber shop. The area has no common accepted name and is served by more than one school district. There are no veteran, civic or community clubs meeting in the area.

18. US–24, the main road in the area was at one time the main artery between Detroit and Toledo, but this ceased when a new and faster route, Interstate 75, was opened a few years ago. Heavy traffic continued to enter the intersection where the branch is located until December, 1963, when a new connecting road to Interstate 75 was opened 3½ miles north of the intersection, uniting US–24 and I–75. From that time the traffic at the intersection decreased materially.

## ISSUE OF LAW

The issue of law presented by the pleadings and proofs is whether the area within which the defendant Bank sought to establish a new branch was a "village" within the meaning of the Michigan law, and if it is not, whether the Comptroller acted arbitrarily, capriciously or abused his discretion in finding that the area was in fact a "village".

It should be pointed out here that in their briefs, defendants contend that the second question, namely the alleged arbitrary or capricious act, or abuse of the Comptroller's discretion, is the only issue in the case. It is true that this case must be eventually decided by determination of that issue, but of necessity this Court must primarily determine whether the area is a "village", for if it is, there is no necessity to determine the second and main issue. On the other hand, if it is not, a finding to that effect is not necessarily determinative of the merits of the case, but the Court must then proceed to determine whether the Comptroller's finding to the contrary constitutes an arbitrary or capricious act, or is an abuse of his discretionary powers.

In the Financial Institutions Act the term "village" is not defined. In the case of Wyandotte Savings Bank v. State Banking Commissioner, 347 Mich. 33, 41, 78 N.W.2d 612, 617, (1956), Justice Talbot Smith, now serving on the bench in the District Court for this District, gave the following as a definition of an unincorporated village:

" * * * merely an assemblage or community of people, a nucleus or cluster for residential and business purposes, a collective body of inhabitants gathered together in one group."

In the case of Bank of Dearborn v. State Banking Commissioner, 365 Mich. 567, at p. 571, 114 N.W.2d 210 at p. 212 (1962) the definition of the term is elaborated, when the Court adopted the trial Court's opinion, which said in part:

"It is a settlement, a centralized populous area having a general common residential and business activity serving the particular area or district. It does not have to be a separate political entity or corporation. It is a 'locality' or 'area to be served.' It has been analyzed as a 'trading area' distinct from that assigned to 'municipality.' "

In that case the Court pointed out that the area in question had a "point of focalization" where there was "located a large shopping center and other commercial establishments serving a district, a community, a collective body of inhabitants, a trading area."

Whether we seek it in the information furnished to the Comptroller by the Bank, in the evidence offered in Court in the present case, or by a personal tour of the area, none of these characteristics can be found in the area involved in the present proceeding.

In the Wyandotte case (supra) the Court made a finding that the area, being about six square miles in size, had a population of between 18,000 and 20,000 persons, having doubled since the 1950 census; "[that it had] over 5,000 homes in the area" and that the "assessed value has more than doubled since 1949", that there were over 5,000 homes, with certain areas "built up solid" and substantial business activity in others. There was a very pronounced building development. There were six elementary schools with plans completed for a high school. There were several churches, supermarkets, drug stores, motels and gasoline stations, restaurants, professional and dental offices,

and considerable space set aside for parking automobiles. This area was described by the Court as "a thriving, growing community * * * [with] 'every type of business except the bank.' " The density per square mile was 3,000 people and 833 houses.

In Community National Bank of Pontiac v. Saxon, 6 Cir., 310 F.2d 224, (1962), Judge Freeman of this District found that the area in which the disputed branch was located was not in fact an unincorporated village, but also held further that the Comptroller's act in determining that the area was a village was not arbitrary, capricious or in abuse of his discretion.

In that case the area involved comprised 1.18 square miles with approximately 292 dwellings, 990 residents, 16 business establishments, a community center, a railroad station and an office building with 60 tenants, including lawyers, dentists, doctors, realtors and other professional and business firms. It was, in other words, an area somewhat comparable in size and population to the area in question in this suit, but possessing considerably more of the other characteristics referred to as necessary to justify considering it as a village.

■ On the basis of the evidence offered in this case, and completely independent of the personal tour of the area by the Court which confirmed the evidence, this Court cannot escape the conclusion that it would indeed be far-fetched to find that the branch Bank is within a "village" within the meaning of that term as used in the Michigan Financial Institutions Act (Section 34, M.S.A. 23.-762, Comp.Laws 1948, § 487.34,) which allows a branch within "a village or city other than that in which it was originally chartered". The applicable section of the National Bank Act (12 U.S.C. § 36c) provides that the Comptroller may authorize branch Banks only at such places within the State in which the Bank is located as are "expressly authorized to State Banks by the law of the State in question" and "subject to the restrictions as to location imposed by the law of the State on State Banks".

Keeping in mind the State Court's interpretation of the term "village" as contained in the Wyandotte and Dearborn cases cited above, there are here not one but at least three separate and unconnected clusters of residences, none of business places. The body of people are not gathered in one group; there is no community center for a nucleus, no professional offices, no centralized populous area, no school or church and no general common residential or business activity. Furthermore there is no indication of recent growth in the number of homes being built to suggest the probability of a change in the near future.

Having made this finding on the basis of the evidence offered in the case, all of which was available to the Comptroller at the time of his determination, this Court must now face the main issue, namely, whether the Comptroller's decision was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law, pursuant to the scope of review under Sec. 1009, Title 5, U.S.C., particularly subdivision (e) (B)-(1) of that Section.

■■ It is true that Congress committed to the Comptroller the initial responsibility of determining whether the several conditions under which a Bank may establish a branch are met. This includes the finding whether the proposed branch be in a "village". It is further conceded that decisions of executive officers on questions of fact are conclusive if reasonably supported by substantial evidence.

■ This Court therefore, despite its conclusion that the area in question was not a "village" must determine from the evidence presented whether the Comptroller's finding was reasonably supported by substantial evidence.

The discretion granted to the Comptroller is not an unlimited one. As stated by Justice White in Burlington Truck

Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962):

"Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion' ", quoting from a dissenting opinion of Justice Douglas in State of New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 96 L.Ed. 662.

In Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470, Justice Frankfurter pointed out that

"the scope of this Court's duty to review administrative determinations under the Federal Communications Act * * * has been carefully defined. Ours is not the duty of reviewing determinations of 'fact,' in the narrow, colloquial scope of that concept. Congress has charged the courts with the responsibility of saying whether the Commission has fairly exercised its discretion within the vaguish, penumbral bounds expressed by the standard of 'public interest.' "

An examination of the Comptroller's file, the application and the other evidence offered in Court leads this Court to the inescapable conclusion that the defendant Comptroller's decision in approving the establishment of the disputed branch bank, was not supported by competent, substantial evidence and must have been based upon misplaced confidence in information supplied by the defendant Bank; that in reaching a conclusion based upon that information and with disregard of the factual situation, the decision was arbitrary, capricious and was an abuse of the discretion under the law as it applies to this situation.

An order may be presented in each of the two cases consistent with this opinion.