352 F.2d 90
 WALKER BANK & TRUST COMPANY, a corporation, Appellant,
v.
James J. SAXON, Comptroller of the Currency, and the First National Bank of Logan, of Logan, Utah, a National banking association, Appellees.
 No. 7981.
 United States Court of Appeals Tenth Circuit.
 October 26, 1965.
 Rehearing Denied December 3, 1965.
 
 Joseph S. Jones, Salt Lake City, Utah (C. E. Henderson and Ray, Rawlins, Jones & Henderson, Salt Lake City, Utah, on the brief), for appellant.
 David L. Rose, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., William T. Thurman, U. S. Atty., and Kathryn H. Baldwin, Atty., Dept. of Justice, on the brief), for appellee James J. Saxon, Comptroller of Currency.
 Ted S. Perry, of Perry & Perry, Logan, Utah, for appellee First Nat. Bank.
 Brief filed by James F. Bell, Washington, D. C., amicus curiæ.*
 Before PHILLIPS, PICKETT and HILL, Circuit Judges.
 HILL, Circuit Judge.
 
 
 1
 Appellant, Walker Bank and Trust Company, brought this action in the court below against appellees, the Comptroller of the Currency and The First National Bank of Logan, to obtain a declaratory judgment decreeing the action of the Comptroller, in authorizing The First National Bank of Logan to establish and operate a branch bank in Logan, to be void and of no legal effect.
 
 
 2
 Both defendants, by separate answers, alleged the validity of the questioned action of the Comptroller and the defendant bank, in addition, raised the affirmative defenses of (1) lack of standing to sue on the part of the plaintiff, (2) estoppel, and (3) that the Utah statute governing the establishment of branch banks is unconstitutional. The trial court, by memorandum opinion, held that the action of the Comptroller was valid and therefore found it unnecessary to pass on any of the affirmative defenses raised. Appellant appealed from that decision.
 
 
 3
 The facts pertinent to this appeal may be briefly stated. Appellant is a banking corporation organized under the laws of Utah, with its main bank located in Salt Lake City and with a branch bank located in Logan. Appellee, The First National Bank of Logan, is a banking corporation organized under the National Banking Act maintaining its principal bank in Logan, a city of the second class. On January 21, 1963, the appellee, Comptroller of the Currency, after application, issued a certificate to The First National Bank of Logan, authorizing it to establish and maintain a new and separate branch bank in Logan in addition to its main bank. Our sole question pertains to the authority of the Comptroller to issue such certificate.
 
 
 4
 We must first look to the Federal and State statutes pertinent to our question. The beginning point is 12 U.S.C. § 36(c), as amended, part of which provides:
 
 
 5
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town, or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; * * *."
 
 
 6
 (c) (2) of § 36 is set forth below[1] and covers specifically so-called "outside branches", that is branches outside the city of the parent bank. Since our facts disclose that we are only concerned with (c) (1) or "inside branches", that is a branch bank located within the same city or town as the parent, we need not pass on (c) (2). Consideration of it in this case will be confined primarily to whatever light it might shed on (c) (1).
 
 
 7
 The Utah Code Ann., Title 7, Chap. 3, § 6 (1953 as amended) provides as follows:
 
 
 8
 "Except in cities of the first class, or within unincorporated areas of a county in which a city of the first class is located, no branch bank shall be established in any city or town in which is located a bank or banks, state or national, regularly transacting a customary banking business, unless the bank seeking to establish such branch shall take over an existing bank. No unit bank organized and operating at a point where there are other operating banks, state or national, shall be permitted to be acquired by another bank for the purpose of establishing a branch until such bank shall have been in operation as such for a period of five years."
 
 
 9
 The parties stipulated that Logan, Utah, is not a city of the first class. Therefore, it is perfectly clear that in Logan, a state bank could not establish a branch bank unless it took over an existing bank which had been in operation for five previous years. The Supreme Court of Utah in Walker Bank & Trust Co. v. Taylor, 15 Utah 2d 234, 390 P.2d 592 (1964) in construing this Utah statute in regard to Provo, Utah, which like Logan is a city of the second class, held that the only way a branch state bank could be established in a city of less than the first class having an existing unit bank is by taking over such existing bank. The obvious question then to decide is this: Does 12 U.S.C. § 36(c) (1) require the Comptroller to withhold his certificate of approval for the establishment of a national bank branch unless the branch is authorized in all respects by the law of the State in which the bank is located? The court below answered this question in the negative resting its opinion on the premise that § 36(c) (1) embodies only the requirement that inside branching be "expressly authorized" to State banks by State law without other conditions or restrictions of State law. In other words, even though a state bank in an identical situation with that presented here could not establish a branch bank, nevertheless a national bank could because state law generally sanctions branch banking. For the reasons hereinafter stated, we disagree with the trial court and hold that 12 U.S.C. § 36(c) (1) provides, as Congress intended it should, that the measuring stick of national branch banks is state law.
 
 
 10
 The history of national bank legislation spans over one hundred years. The present Act was derived from the Act of June 3, 1864, 13 Stat. 99, which was the National Bank Act. During this period, a multitude of changes in the Act have occurred as various economic problems were encountered. The provisions of the Act affecting branch banking entered the scene in 1927. Before that time branch banking was not generally sanctioned by Congress. See First National Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486. The Court there noted that the various state laws are binding on the dealings and contracts of national banks unless and until those laws conflict with federal laws or frustrate the purpose for which national banks were created or impair their efficiency. With national banks unable to branch, state banks did branch where state law permitted placing the national banks at a considerable disadvantage in the competitive banking field. It was against this background that Congress provided for national bank branches in the McFadden Act of 1927, 44 Stat. 1224, 1228 on branch banking.[2] Congressman McFadden reported on this bill from the Committee on Banking and Currency. In the beginning, the Committee Report states, "Some of the provisions in the bill extend and enlarge the powers of national banks, but only in the manner in which State banks and trust companies generally have been successfully operating within recent years."[3] Later in the same report in discussing Section 8 it is stated, "This section recognizes the right of national banks to establish branches within those cities in which State banks have that privilege * * *." Finally, the report concludes in part with, "The cumulative effect of its provisions will produce a situation in the Federal reserve system where the rights of the national banks will be more nearly on a par with those of the State member banks." It seems clear to us at this juncture, that Congress meant in the McFadden Act to put national banks on a par with state banks insofar as branching was concerned, and to do this, they made state law controlling on the question of national bank branches. But our investigation of the history of branch banking cannot end here, for in 1932, owing to the financial crisis of those times, Congress again considered branching by national banks.
 
 
 11
 In 1932 the Senate considered a bill (Senate Bill 4412) which would allow branch banking by national banks irrespective of the various state laws. Senator Glass, the committee chairman, did point out at the time that this was a highly controversial subject.[4] The main objection the opponents had to this bill concerning the branching provision was that it would constitute an invasion of the sovereign rights of the states to establish federal banks within their boundaries not approved by local policy. Apparently at this time, most states did not approve of branch banking.[5] It was at this time that Senator Bratton[6] of New Mexico offered his amendment to the bill which as modified was finally passed. We deem Senator Bratton's comments in regard to the bill highly noteworthy when in Vol. 76, Cong. Rec. p. 1449, he indicated that under existing law a national bank may engage in branch banking if the law of the state where the national bank is situated permits state banks to do so. Then in commenting on the Glass bill he said, "It is proposed to permit national banks to engage in branch banking whether the law of the State in which a given bank is located permits it or not. It is proposed now to permit national banks to disregard the sentiment of a given State with respect to that question. I think the proposed bill goes too far. It seems to me that the question of whether branch banking shall be permitted in a given State should be determined by the State." The Bratton Amendment was then presented and adopted in the Glass bill.[7] This amendment concerning branch banking also expanded national banks into outside branches or branches outside the city or town of the parent bank. This is (c) (2) of the present section concerning such banks.
 
 
 12
 Although the Glass Bill including the Bratton Amendment passed the Senate, it failed to pass the House until the next session when the bill was passed by both houses with the Bratton Amendment intact. Two other Congressional comments made in 1933, when § 36(c) was under consideration in the Congress, one by Senator Glass[8] and the other by Congressman Luce,[9] support our interpretation of this statute.
 
 
 13
 With this, our review of the history of branch banking and § 36(c) ends. From it all, we are led to the inescapable conclusion that the purpose of allowing national banks to branch was to enable them to fairly compete with state banks. In enabling them to do this, Congress said in the McFadden Act that State law will in each instance determine whether to permit a national bank to branch. This policy was again carried over in the Banking Act of 1933 through the Bratton Amendment despite the fact that originally the Glass bill sought to change that policy. It seems to us a frustration of that policy to say as the trial court did that merely because a state in a broad general way sanctions branch banking, that is enough to permit a national branch, even though other vital provisions of state branching laws are not met. In other words, we believe the proper approach is for the Comptroller to look at all the State law on branch banking not just part of it.[10] While we entertain no doubt of Congress' authority to regulate national banks in whatever way it deems fit, we are convinced that in this area of the law, Congress has restricted its power and acceded to state law which it may certainly do. It is clear to us that the Congress intended to create and maintain a competitive equality between state and national banks. The trial court's interpretation of Congressional intent is to the contrary and would result in giving the national banks a substantial competitive advantage. The Comptroller exceeded his statutory authority in the issuance of the certificate authorizing appellee bank to establish and maintain the branch bank.
 
 
 14
 We will refrain from passing on any of the affirmative defenses raised by the answer of The First National Bank of Logan because the trial court must properly be given the first opportunity to determine their merits, if any. The judgment of the trial court is reversed and the case is remanded with directions to reopen the same for the taking of any additional evidence, if offered, on the remaining issues and to make appropriate findings of fact and conclusions of law not inconsistent herewith.
 
 
 
 Notes:
 
 
 *
 Leave was granted to the National Association of Supervisors of State Banks to file a brief in the case as amicus curiæ
 
 
 [1]
 12 U.S.C. § 36(c) (2) provides in pertinent part:
 "A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by [the] statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *"
 
 
 [2]
 "(c) A national banking association may, after the date of the approval of this Act, establish and operate new branches within the limits of the city, town, or village in which said association is situated if such establishment and operation are at the time permitted to State banks by the law of the State in question."
 
 
 [3]
 H.Rept.No. 83, 69th Cong., 1st Sess. (1926)
 
 
 [4]
 Cong.Rec. Vol. 75, p. 9890
 
 
 [5]
 See Cong.Rec. Vol. 75, pp. 9891, 13,002; Vol. 76 pp. 1449, 1997, 2079, 2080, 2090, 2205, 2206
 
 
 [6]
 The Honorable Sam G. Bratton later became a distinguished and highly esteemed member of this court, serving from 1933 until his retirement in 1961
 
 
 [7]
 Cong.Rec. Vol. 76, p. 2205. The amendment read as follows with its amendment
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches within the limits of the city, town, or village, or at any point within the State in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question and subject to the restrictions as to location imposed by the law of the State on State banks. No such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a paid-in and unimpaired capital stock of not less than $500,000."
 
 
 [8]
 Senator Glass, in Vol. 77 Cong.Rec. 3726 (1933) said:
 "There was another more or less important provision of the bill passed last spring which is retained in text in this bill, relating to branch banking. It will be recalled that, as reported from your Banking and Currency Committee, the provision authorized national banks to engage in branch banking in the respective States, regardless of State law. The Senate so amended that provision as to authorize national banks to engage in branch banking in those States which by law permit branch banking to State Banks. It went even further under the amendment of the distinguished Senator from New Mexico, and required that the establishment of branch banks by national banks in States which by law permit branch banking should be under the regulations required by State law of State banks.
 "How any fair person may properly object to a provision of that sort, I do not understand. We here in the Congress created the national banking system in the emergency of the Civil War. We here restrict it and regulate it. We here legislate for the national banking system; and why anybody should object to putting national banks on a plane of competitive equality with State banks in the respective States we have been unable to understand. Therefore, we have included that provision in this bill just as it passed the Senate."
 
 
 [9]
 Congressman Luce stated in Cong.Rec. Vol. 77, p. 5896:
 "In the controversy over the respective merits of what are known as `unit banking' and `branch banking systems,' a controversy that has been alive and sharp for years, branch banking has been steadily gaining in favor. It is not, however, here proposed to give the advocates of branch banking any advantage. We do not go an inch beyond saying that the two ideas shall compete on equal terms and only where the States make the competition possible by letting their own institutions have branches. In short, we say only that if a State invites the race, let the better horse win. That system which proves itself the better able to serve the people will in the end prevail."
 
 
 [10]
 For other cases tending to support this view although each construing § 36(c) (2) dealing with outside branches instead of (c) (1) see the following. National Bank of Detroit v. Wayne Oakland Bank, 6 Cir., 252 F.2d 537, cert. denied, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69; State of South Dakota v. National Bank of South Dakota, D.C., 219 F.Supp. 842; Commercial State Bank of Roseville v. Gidney, D.C., 174 F.Supp. 770, aff'd per curiam, 108 U.S.App.D.C. 37, 278 F.2d 871 (1960); and see Rushton ex rel. Comr. of Bkg. Dept. v. Michigan National Bank, 298 Mich. 417, 299 N.W. 129, 136 A.L.R. 458. We also note, in a factually similar case construing (c) (1) from Utah decided by the U.S. District Court, District of Columbia, held exactly as we do here. Commercial Security Bank v. Saxon, 236 F.Supp. 457 (1964)