**AMERICAN BANK AND TRUST COM-
PANY, a Michigan banking cor-
poration, Plaintiff,**

v.

**James J. SAXON, as Comptroller of the
Currency of the United States of Amer-
ica, and Dart National Bank, of Mason,
Michigan, a national banking corpora-
tion, Defendants.**

**Civ. A. No. 4833.**

United States District Court
W. D. Michigan, S. D.

Dec. 13, 1965.

Foster, Campbell, Lindemer & McGurrin, Lansing, Mich., Richard B. Foster and Theodore W. Swift, Lansing, Mich., of counsel, for plaintiff.

Harold D. Beaton, U. S. Atty., Grand Rapids, Mich., Department of Justice,

Richard Beatty, Washington, D. C., for defendant Saxon.

Marshall, O'Brien & Skehan, Lansing, Mich., John P. O'Brien, Lansing, Mich., of counsel, for defendant Dart Nat. Bank.

FOX, District Judge.

The present motion for partial summary judgment raises two questions relating to the action of the Comptroller of the Currency in passing upon applications of national banks for branch offices pursuant to Section 36(c) of the National Bank Act, 12 U.S.C.A. § 36(c).

The court is asked to decide both whether or not the Comptroller must grant a formal adversary hearing to protestants of such applications and whether or not the requirement of Section 34 of the Michigan Financial Institutions Act (M.S.A. 23.762, Comp. Laws 1948, § 487.34) that state banks, applying to the state banking commissioner for a branch banking site, must demonstrate the "necessity for the establishment of such branch or branches and the prospects of successful operation," is a consideration applicable to the decision of the Comptroller.

The facts of this case disclose that on or about March 20, 1964, the defendant Dart National Bank filed an application with the defendant Comptroller for a certificate of authority to establish a branch bank in the Village of Holt, Michigan.

On April 3, 1964, plaintiff notified the defendant Comptroller by letter of its objections to the application, and requested a formal hearing on the application.

An informal meeting between an agent of the Comptroller and representatives of plaintiff bank took place, and then on or about April 14, 1964, defendant Comptroller indicated his intention to issue the defendant Dart National Bank a certificate of authority to establish a branch bank at a site in the Village of Holt.

Plaintiff thereupon sought and received in this court a temporary restraining order against the issuance of such a

certificate of authority. By stipulation, Dart National Bank and the Comptroller agreed that a certificate of authority would not issue during the pendency of this action.

Section 36(c) of the National Bank Act (12 U.S.C.A. § 36) provides the statutory setting for the application here involved.[1]

The first of the questions which the court will treat in this opinion is whether or not the Comptroller is required to conduct a formal hearing in reviewing and deciding upon an application such as the one in suit.

5 U.S.C.A. § 1009, of the Administrative Procedure Act, reads in relevant part as follows:

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion.

"(a) Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof."

No statute precludes judicial review of the Comptroller's decision, nor is his decision committed by law to his discretion. Therefore, by the clear language of the statute, one suffering legal wrong by reason of the decision of any agency may seek judicial review.

■ The Comptroller's decisions are therefore reviewable. Commonwealth Natl. Bank v. Saxon, 310 F.2d 224 (CCA 6, 1962); Commercial Security Bank v. Saxon, 236 F.Supp. 457 (D.D.C.1964).

The questions involved here are the extent to which the decision may be reviewed and the extent, if any, of a hearing which the Comptroller must provide in reaching his decision.

On the issue of a hearing, plaintiff relies most heavily on the case of First Natl. Bank of Smithfield v. Saxon, 232 F. Supp. 725 (D.N.C., 1964), in which the District Court held that a hearing in conformity with the Administrative Procedure Act (5 U.S.C.A. § 1001 et seq.) was necessary to validate the Comptroller's approval of a branch.

That decision was appealed to the United States Court of Appeals for the

1. A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, *and subject to the restrictions as to location imposed by the law of the State on State banks.* In any State in which State banks are permitted by statute law to maintain branches within county or greater limits, if no bank is located and doing business in the place where the proposed agency is to be located, any national banking association situated in such State may, with the approval of the Comptroller of the Currency, establish and operate, without regard to the capital requirements of this section, a seasonal agency in any resort community within the limits of the county in which the main office of such association is located, for the purpose of receiving and paying out deposits, issuing and cashing checks and drafts, and doing business incident thereto: *Provided,* That any permit issued under this sentence shall be revoked upon the opening of a State or national bank in such community. Except as provided in the immediately preceding sentence, no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a paid-in and unimpaired capital stock of not less than $500,000: *Provided,* That in States with a population of less than one million, and which have no cities located therein with a population exceeding one hundred thousand, the capital shall not be less than $250,000: *Provided,* That in States with a population of less than one-half million, and which have no cities located therein with a population exceeding fifty thousand, the capital shall not be less than $100,000." (First emphasis supplied.)

Fourth Circuit, 244 F.Supp. 389, and in the interim between the appeal and that court's decision, two district courts expressly disagreed with the decision reached in Smithfield.

In the case of Peoples Bank-Trenton v. Saxon, 244 F.Supp. 389, (E.D.Mich.,) the court recognized the decision in Smithfield, supra, in considering a motion for summary judgment, but chose to follow other precedents in finding that due process had not been denied by lack of a formal hearing.

In the case of Continental Bank v. Natl. City Bank, Civil Action C65–484 (N.D.Ohio), 245 F.Supp. 684 the court held that regardless of whether a formal hearing had been requested or not, there was no requirement that such a hearing be held.

On October 21, 1965, a decision was rendered by the Fourth Circuit Court of Appeals in the Smithfield case, supra. Judge Bryan, speaking for the majority, held that the Administrative Procedure Act did not require a formal hearing by the Comptroller.

The court held that procedural due process was not offended by lack of a formal hearing, since it was within the power of Congress to exclude a hearing provision from the National Bank Act. In further support of its finding of no deprivation of due process, the court pointed to the availability of judicial review to an aggrieved party.

■ This court will follow these decisions, particularly in view of the fact that, with the reversal of the Smithfield case, plaintiff can point to no decided cases favorable to its position on this issue.

■ Proceeding to the "necessity" question, the authorities are decidedly less clear.

Section 36(c) of the National Bank Act [2] does not expressly call for such a determination by the Comptroller. Any such requirement must be supplied by implication, and this court, after reviewing the legislative history, the legal precedents, and the briefs and arguments of the parties to this suit, is unable to do so.

An investigation of the national and Federal Reserve banking systems was undertaken by the Senate Banking Committee as a result of the great number of bank failures in the depression period.

The Committee proposed to authorize national banks to establish branches "not merely in the towns and cities in which they are located but also outside of such limits at any point within the borders of the state in which they exist, *irrespective* of state laws." (Emphasis supplied.) S.Rept. 584, 72nd Cong., 1st Sess., p. 11 (1932).

Opposition to the proposed bill was voiced by those members of the Committee who viewed it as fostering excessive centralization and as a threat to the state banking system.

Senator Glass, one of the co-sponsors of the bill, noted that 90% of the bank failures between 1921 and 1931 had occurred in relatively small cities and attributed the problem to rural bank failures. 75 Cong.Rec. 9892. In his view the concentration of industry and commerce in more urban areas had decreased the opportunities available to rural banks, with the result that they experienced difficulty in attracting skilled personnel, did not have the diversity of investment opportunities of the urban banks and were generally more likely candidates for insolvency. Id. at 9896–7. Accordingly, he favored experimentation with branching because the larger banking systems would not suffer from the debilities he ascribed to the smaller banks and thus would be less likely to fail.

The predominant objection to his proposals was that they could establish a system of banking within a state which had declined to permit such a system (branch banking) to its own banks. 75 Cong.Rec. 9890, 13002 (1932); 76 Cong. Rec. 1449, 1997, 2079, 2090, 2206 (1933); 37 Op.Atty.Gen. 325, 326–7 (1933).

---

2. See footnote (1), supra.

In discussion on the floor of the Senate in 1933, Senator Bratton of Utah, an opponent of the bill's branch banking provisions, spoke out in support of the view that national banks should not be permitted to branch regardless of whether a particular state desired to permit branch banking or not, and further stated that each state should be permitted to determine whether or not branch banking should be permitted within its borders. 76 Cong.Rec. 1449, 1450.

Senator Glass, while preferring the unlimited branching provisions of the bill, had stated that he would accept, in order to obtain passage of the bill, provisions "which would confine branch banking to those states which permit it to State banks." 76 Cong.Rec. 1997.

Senator Bratton introduced an amendment which provided, in final form, for establishment and operation of national branch banks "if such establishment and operation are at the time expressly authorized for state banks by the law of the State in question." 76 Cong.Rec. 2079. The phrase "and under restrictions as to location imposed by the law of the State on State banks," was suggested as an addition by Senator Blaine of Wisconsin, and the amendment of Senator Bratton, with the addition suggested by Senator Blaine was proposed and passed by the Senate.

The bill emerged from a Senate-House conference committee with the branch banking provisions intact, and with minor changes in the language of the bill.[3]

From the welter of statements made by proponents of the factions debating the bill, plaintiff here contends that it was the intent of the Congress in this Act to place the two banking systems in parity, and that therefore all the requirements imposed by the State for establishment of branch banks by state banks are fully applicable to branches of national banks.

The defendants argue that the bill was intended by Congress to permit national banks to branch on condition that branch banking as a system is authorized by the state to state banks, and without regard to the specific limitations imposed by state law, other than location and capitalization, which are expressly made conditions by § 36.

As to parity, defendants argue that the design was to establish competitive equality, and therefore if a state does not permit branch banking, a national bank is prohibited from opening a branch. However, once a state does permit branch banking, national banks may also branch, subject only to the limitations found in the National Bank Act.

■ The national banks are organized as a discrete system, and, as such, are immune from state control except insofar as Congress permits. Farmers' & Mechanics' Natl. Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196; McCulloch v. State of Maryland, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579; Traverse City State Bank v. Empire Natl. Bank, 228 F.Supp. 984 (D.C.W.D.Mich., 1964).

Thus, the statute controls, and the only restrictions on the Comptroller's approval are those contained in 12 U.S.C. § 36. Plaintiff acknowledges this but argues that the statute reveals by its legislative history that the state restrictions are to be imposed on national banks.

12 U.S.C. § 36(c) (1) allows national banks to branch within the limits of the city, town or village in which the bank is located "if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question."

---

3. The clause "if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question" was changed to "if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition * * *." The provisions of the McFadden Act for "within city" branching were also separated from the new provisions.

12 U.S.C. § 36(c) (2) provides for branching anywhere within the state "if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks."

Because of the confusion which arises from attempts to interpret the various statements of the several leading figures debating the bill in Congress, the court is of the opinion that the only practical guides to the resolution of this issue are the statute itself and the case law bearing on this point.

Section 36(c) (2), as opposed to Section 36(c) (1), contains two limitations:

(1) National banks may branch only if the establishment and operation of branches are authorized to state banks by state statute, and

(2) National banks are subject to location restrictions imposed by state law on state banks.

Plaintiff, to sustain its position, must establish that one of these two restrictions incorporates as to national banks the requirements imposed on state banks for branch banking.

To say that the first limitation so reads, that is, that it is not merely a requirement that branch banking as a system be authorized in the state in question, but that the national banks, in order to branch, must become, in effect, state banks subject to all the requirements which state law imposes before granting of a branch bank application, violates a long standing guide to statutory construction.

█ Courts should read a statute so as to give effect to every word and every clause, and ought not adopt a reading which makes part of a statute redundant. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859; United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615; Fowler Bros. & Cox v Commissioner of Internal Revenue, 138 F.2d 774 (CCA 6, 1943).

Thus, to give the meaning contended for by plaintiff to the first clause would be to render the "location" clause nugatory.

█ If the "location" clause is to supply the meaning argued for by plaintiff, the court must read into the word "location" the necessity and "prospects for successful operation" requirement, as well as the other terms of MSA 23.762, which governs the establishment and operation of branch banks in Michigan. To do so would contravene the canon of statutory construction which dictates that, absent indications to the contrary, words used in a statute are assumed to have their natural, ordinary, and familiar meaning. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492, United States v. 525 Co., 342 F.2d 759 (CCA5, 1965), Folker v. Johnson, 230 F.2d 906 (CCA2, 1956).

█ A "location" is "a position or site occupied or available for occupancy * * *, an area or tract of land * *." Webster's Third New International Dictionary (unabridged).

With reference to the Michigan branch banking statute (MSA 23.762) location restrictions are clearly geographical restrictions, and this is the inescapable meaning to be attached to "location."

Thus from a reading of the statute, it does not appear that restrictions on state branch banking, other than those relating to location, are applicable to national banks seeking to establish branches outside the limits of the municipality in which it is situated.

Decided case law supports this position. In the Peoples Bank-Trenton case, supra, the court passed on the question and specifically held that if the "prospects of success" or necessity limitations of the state statute were intended to be restrictions on the Comptroller, they would certainly have been included in the National Bank Act, just as the location and capitalization requirements are.

In the case of First National Bank of Smithfield v. Saxon, supra, the majority held that the contention that the Comptroller's approval of a branch banking application must be conditioned upon compliance with the requirements of the state statute was without merit. The North Carolina statute involved required, inter alia, necessity and prospects for success to be present to the satisfaction of the State Banking Commissioner.

However, although not finding a requirement that the Comptroller be bound by state law on the subject, the court did find that his approval of branch banking applications must involve consideration of the public interest, need, and necessity, and that his discretion in so determining was subject to court review.

Furthermore, the court held that the location determination was subject to trial *de novo*.

The plaintiff's contention that state law should be applied to the Comptroller is made largely ineffectual by the decision of the Michigan Supreme Court in Rushton v. Michigan Natl. Bank, 298 Mich. 417, 299 N.W. 129, 136 A.L.R. 458, in which the position was taken that approval of the State Banking Commissioner was necessary before national banks could open branches. His approval could not be given, under state law, without compliance with the statute.

The court held that although state law did require this approval for state banks, it was not required in the case of national banks. As stated by the court:

"There is here no suggestion that an unqualified or unconditional right need be given by state law to state banks to establish and operate branches before national banks may do likewise without the sanction of the administrating state banking office." Id. at 299 N.W. 134.

The court found that once a state had committed itself to the public policy of allowing branch banking, state limitations could not be applied to the Comptroller, and his approval alone was required for the establishment and operation of branch banks of national banking institutions in Michigan.

█ Thus, under Michigan law, which plaintiff seeks to apply, the approval of the State Banking Commissioner, which includes a finding on necessity and prospects for successful operation, is not necessary in the Comptroller's decision to grant a branch banking application to a national bank.[4]

4. The court succinctly stated its reasoning in the following paragraphs:
"There is here no suggestion that an unqualified or unconditional right need be given by state law to state banks to establish and operate branches before national banks may do likewise without the sanction of the administrating state banking office. Rather the thought was to place both banking systems upon an equal competitive plane. An affirmative grant of authority is 'that which delcares posiitively; that which avers a fact to be true; that which establishes; the opposite of negative.' Black's Law Dictionary, 3d Ed.; Hubbard v. Fort, C.C., [3 Cir.,] 188 F. 987, 996.
"Plaintiff takes the basic position that where the Congress of the United States and a State legislature have, within concurrent spheres of regulation, enacted consistent statutes and the Congress has, as in this particular instance, expressly recognized the propriety of leaving to each State of the Union some reasonable measure of power to declare public policy on the same subject matter, they are to be construed as constituting harmonious systems, so long as they admit of no unjust discrimination which may not be checked by the courts and that therefore approval of the Commissioner of Banking of the State must be sought and obtained before a national bank may establish or maintain branch banks.
"Studying the development of the legislation under consideration a different result must be reached. The state has 'by language specifically granting such authority affirmatively and not merely by implication or recognition' provided for state branch banking by state banks. Under Section 114 of the Public Acts of 1937, No. 341, state banks may consolidate and with the written permission of the Commissioner of State Banking establish and operate as a branch or branches the consolidating bank or banks. By the federal enactment equal privi-

The case of Walker Bank & Trust Co. v. Saxon, 352 F.2d 90, (10th Cir., October 26, 1965) is also cited by plaintiff in support of its position here. While the holding in that case is not easily reconciled with that reached in this opinion, it should be noted that the issue in that case dealt with an application under § 36(c)(1) which does not contain all of the language, including the "location" clause of § 36(c)(2).

Furthermore, the court in reaching its decision in the Walker case, supra, expressly confined its holding to § 36(c)(1), and declined to pass on § 36(c)(2).[5]

To the extent, if any, that the Walker decision is in conflict with the Smithfield and Peoples Bank-Trenton cases, supra, this court declines to follow it and chooses instead to adopt the holdings of the latter two cases on this issue.[6]

Finally, although the Comptroller is not required to make formal findings of necessity and prospects for successful operation under the statute, and while this court cannot follow the rule of the Fourth Circuit in determining the "location"

---

leges are available to national banks with the approval of the Comptroller of the Currency. 'Only where the States make the competition possible by letting their own institutions have branches' are national banks to have branches. Having made the competition possible, national branches as corporate instrumentalities of the United States created for public purposes need look only to the terms of the National Bank Act for guidance and approval of their actions.

\*    \*    \*    \*    \*

" 'If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action.' 4 Wheat. page 405, 4 L.Ed. 579." Id. at 134–135.

5. The Walker court in a footnote to its opinion cited a number of cases "tending to support" its view. The court feels that two of them are deserving of mention.
One of these in the Rushton case, supra, which is dealt with in the body of the opinion. The other is Natl. Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537, cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (C.C.A.6, 1958). While language in that opinion could be construed to support the position that state law governs the establishment of national bank branches, when read in conjunction with the central issue of that case, whether or not a national bank could branch at a site forbidden by state law, it tends rather to support the conclusion reached in this case. The following quotation focuses attention on the question before that court, and its view of the law relevant thereto:
"The history of federal legislation regarding branch banking and the statutes

applying thereto leave a clear and definite impression that Congress intended, with respect to the location of branches, that a national bank should have no greater rights than it would if it were a state bank, and that a national bank was to be permitted to establish and operate a branch in a state *only at such a point as it could, by express provisions of a state statute, eslish and operate a branch if it were then a state bank.*" Id. at 540. (Emphasis supplied.)

6. § 36(c)(1) is derived from the McFadden Act of 1927, in which Congress first provided for national bank branches. The impetus behind this act was the fact that certain states authorized state banks to branch, but since there was no federal legislation on the subject, national banks, bound by federal law, could not establish branches in those states and were thus placed at a competitive disadvantage. See e.g. First Natl. Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486. That act, however, expressly limited national banks to branches within the limits of their home cities. However, the Glass-Steagall Act was introduced not to correct an imbalance in competition, but to attempt to correct an economic situation felt to be detrimental to the national welfare. Since national banks could not look to state law for authority by virtue of their being part of the national bank system, Congressional authorization was necessary for more extensive branching powers in the national banks. This was provided by the Glass-Steagall Act, or the Banking Act of 1933. Had Congress intended precise parity between the two systems, it could have so provided by plain language to that effect. Such language is conspicuously absent in the statute.

question *de novo* because of the decision of the Sixth Circuit in Community Natl. Bank of Pontiac v. Saxon, supra, the Comptroller's decision is not so protected as to be beyond effective judicial scrutiny.

The Michigan statute (MSA 23.762) provides that no branch bank shall be established in a village in which there is another bank or branch in operation.

■ Implicit, therefore, in the Comptroller's decision to issue a certificate of authority, is a finding that a separate village exists in the area in question, in compliance with the "location" restriction of 12 U.S.C. § 36(c) (2).

■ The finding of a "village" is reviewable in accordance with the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. The standard to be applied is whether or not the Comptroller's finding is supported by substantial evidence, whether or not it is arbitrary or capricious.

■ The Michigan Supreme Court has considered the "village" in question, and from the cases of Wyandotte Savings Bank v. Eveland, 347 Mich. 33, 78 N.W.2d 612, and Bank of Dearborn v. Taylor, 365 Mich. 567, 114 N.W.2d 210, it is apparent that economic considerations are important factors in deciding upon the existence or nonexistence of a village in banking terms.[7]

Thus, although other factors unquestionably enter into the determination, and despite the fact that there is no formal requirement for a finding of necessity and prospects for successful operation, to the extent that the economic factors incident to the "village" question bear on the latter two considerations, the court is in a position to weigh them in passing on the Comptroller's decision.

The court holds that no formal hearing is required in regard to branch banking applications before the Comptroller of the Currency, that the Comptroller's approval is a matter of discretion, subject only to the expressed limitations of the National Bank Act, as indicated in the opinion, and that economic factors, even though relevant to the questions of necessity and prospects for successful operation, may be reviewed and considered by the court insofar as they relate to the question of whether or not a village exists under Michigan law.

An order may be prepared in accordance with this opinion.

## APPENDIX

The history of the depression times provides an important clue to the interpretation of 36 U.S.C.A. § 36(c) (2).

Because of the crisis of confidence in the ability of banks to meet the demands of depositors, an unprecedented number of withdrawals occurred, with the result that many banks actually could not meet these demands. This in turn generated increased pessimism and more attempts to withdraw funds from banks.

Banks were unable to marshal enough currency to satisfy the demand and the crisis deepened.

---

7. "The word 'village' is not a technical word, or one having a peculiar meaning, but is a common word in general usage with an ancient lineage. It is merely an assemblage or community of people, a nucleus or cluster for residential and business purposes, a collective body of inhabitants, gathered together in one group." Wyandotte Savings Bank v. Eveland, 347 Mich. 33, 78 N.W.2d 612, at 617.
"Its frame of reference in common usage is nebulous rather than exact, and is akin to 'vicinity,' 'neighborhood' and 'community.' Cf. Lukens Steel Co. v. Perkins, 70 U.S.App.D.C. 354, 107 Fed. 2nd 627 (D.C.Cir.1939) reversed on other grounds (310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). It is a settlement, a centralized populous area having a general common *residential and business activity serving the particular area or district*. It does not have to be a separate political entity or corporation. It is a 'locality' or 'area to be served.' It has been analyzed as a *'trading area'* distinct from that assigned to 'municipality.'" Bank of Dearborn v. Taylor, 265 Mich. 567, 114 N.W.2d 210, at 212. (Emphasis supplied.)

In Michigan, as an example, banks closed as usual on February 11, 1933, a Saturday. Monday was a legal holiday, and over the long weekend, Governor Comstock was requested, by both the Michigan State Bankers Association and the Detroit Clearing House Association to declare a state-wide banking holiday.

This he did, proclaiming a State banking holiday for ten days from February 14. This was extended from time to time until the General Banking Holiday was declared by President Roosevelt on March 6, 1933. Similar activities occurred in most other states.[1]

President Franklin D. Roosevelt was inaugurated March 4, 1933.[2] After calling Congress into an extra session by reason of the "extraordinary occasion," his first official act, indicating the gravity of the situation, was his proclamation issued at 1:00 A.M. on March 6, 1933, declaring a national bank holiday.[3]

The Emergency Banking Act was passed by Congress three days later.[4]

In his first "Fireside Chat," March 12, 1933, the President explained the banking problem to the public and set forth some of his views on the steps which were being taken to remedy what he termed a "bad banking situation."[5]

The condition of the banking system demanded reform, and it was in response to this need for revision that Congress passed the Banking Act of 1933.[6]

On June 16, 1933, the last of the "Hundred Days," the Banking Act of 1933 was signed by the President. During that period, in order to organize the country and restore the confidence of the public, fifteen major bills, including the Banking Act of 1933, were enacted, under the guidance of the President. There can be no question but that this legislation was brought forth in response to his wishes and his urging.[7]

With this background, it is apparent that the legislation in question was not drafted with a special interest group in mind, but was a part of President Roosevelt's program of recovery, designed to consolidate the American people for the task of emerging from the days of the depression period. To now urge that the statute should be construed in favor of the interests which opposed its passage, even at a time when the aim of the President was to conserve the system within which banks operated, and to strengthen them against future crises, is to blindly ignore the history of both our country and this legislation.

1. O'Connor, The Banking Crisis and Recovery under the Roosevelt Administration, pp. 11, 12 (1938).

2. The Public Papers and Addresses of Franklin D. Roosevelt, Vol. II, 17 (1938).

3. O'Connor, supra, note 1, at p. 15.

4. Idem.

5. The Public Papers and Addresses of Franklin D. Roosevelt, supra, note 2, at 61, 64.

6. Faulkner, American Political and Social History, Vol. II, 694–696 (1944).

Dumond, America In Our Time, p. 522 (1947).
Southworth, Banking Facilities for Bankless Towns, p. 57 (1941).
Beard and Smith, The Old Deal and the New, p. 92 (1940).
Beard and Smith, The Future Comes, a Study of the New Deal, pp. 99–100 (1934).
Lapp, The First Chapter of the New Deal, p. 138–9 (1933).

7. Schlesinger, The Coming of the New Deal, pp. 16–23 (1958).
Morison, The Oxford History of the American People, pp. 954, 959 (1965).